PEOPLE v. LAHNALA.

1. EVIDENCE—HOMICIDE—IMPEACHMENT OF WITNESS.
On the trial of a homicide case, it was improper to permit the prosecuting attorney to impeach the mother of the accused, who testified in his favor, upon being called by the prosecution, on immaterial statements alleged to have been made by her, and, the tendency of such testimony being to raise a false issue, was of so prejudicial a nature as to require the reversal of the conviction.

2. CRIMINAL LAW—IMPEACHMENT—EVIDENCE—HOSTILE WITNESSES.
It is competent for the prosecution to prove material contradictory statements of a witness who appears to be hostile, and whom the law compels the prosecutor to call as one of the eyewitnesses, or persons having knowledge of the circumstances, for the purpose of affecting his credibility.

Error to Houghton; O'Brien, J. Submitted June 26, 1916. (Docket No. 129.) Decided September 26, 1916.

John Lahnala was convicted of murder in the first degree. Reversed.

*Grant Fellows,* Attorney General, *L. W. Carr,* Assistant Attorney General, *William J. Galbraith,* Prosecuting Attorney, and *Edward McCormack,* Assistant Prosecuting Attorney, for the people.

*Burritt & Burritt,* for respondent.

OSTRANDER, J. August Lahnala was a farmer living in Stanton township, Houghton county, west, or northwest of Houghton, on a highway known as the canal road. The 5th day of September, 1914, was Saturday. August Lahnala, some of his children, and some hired men worked that day on his farm baling hay. In the evening he went to Oskar, a point between

his farm and Houghton, purchased and carried home some articles, riding a part of the distance, and to the entrance to his farm, with an acquaintance. He arrived home about 8 o'clock. His wife, some of his minor children, and a hired man had retired in the upper floor of the house. The house was dark, and he entered through a shed sheltering the kitchen door into the kitchen, placing his parcels on the kitchen table. With the noise he made in entering and soon after he had entered three shots were heard, and probably the noise made by his falling body and his cry after he was shot. No voice except his was heard; no sound of altercation or of a struggle. The investigation immediately made with a lighted lantern by his wife and the others there discovered his body on the floor, wounded, him incapable of moving or of speaking. He survived but a few moments. An attempt to use the telephone failed, and fear, it is said, prevented any one present leaving the house to summon aid until early morning. In the morning it was discovered that the telephone wires had been cut at a pole near the house, three empty cartridge shells were found in the shed, two bullets were buried in woodwork in the kitchen, one of which was recovered, and one was taken from the wound. The shells and bullets were such as are used in an automatic 32 caliber gun, and were manufactured by the Winchester Arms Company. A single footprint was found in the earth at the foot of the brace to the telephone pole upon which the wires were cut. A "pliers," with which wire can be cut, was found at or near the foot of the telephone pole. Nothing else about the premises connected with the tragedy appears to have been found or seen.

Besides his wife, Matilda, August Lahnala's family included several married sons and daughters, not living at home, and six or more minor children, some of whom

lived at home. Among the minors was John Lahnala, 18 years old September 20, 1914, who lived at home until May, 1913, when he left to work in one of the mines, returning to assist his father with the haying. He then went to Minnesota and Dakota, selling his labor, returning to Michigan in January, 1914. He visited his family and within a few days—three, perhaps—hired himself to work for a John Zurcher, who lived near by, with whom he remained until some time in April, 1914, frequently visiting his father's house. Then, his brother William having bought a farm in Alger county, John purchased land adjoining his brother's, and, William having built a house on his land, John made his home with his brother, working on his land and elsewhere until September, 1914, not returning to his father's home during that time.

The land which William and John owned was not far distant from Rumley, which is a station on the Munising & Southeastern railway near the line between Alger and Marquette counties. A railroad map of Michigan will show the railroads operating in the vicinity and the various junction points. To the west of Rumley, beyond Little Lake, south of Negaunee, on the Chicago & Northwestern Railway, is Swanzy. That John Lahnala was at Swanzy in the afternoon of September 4, 1914, and in the station of the Chicago & Northwestern Railway, is an undisputed fact. It is the theory of the people that from this point he went by train to Negaunee, there boarded a South Shore train for Houghton, which he reached about 8 o'clock 'p. m. on that day; that he was seen during the evening in Houghton, spent the night somewhere, was seen about Hancock and Houghton Saturday forenoon; that he visited his father's home in the evening, murdered his father, was seen passing along the road going away from his father's house shortly after the crime was committed, that he left Houghton that night, and was

at his brother's home on Sunday, September 6th. In this theory the motive for murder is ill feeling and dislike of the father by the son. The son owned an automatic gun of the caliber, and which would use cartridges such as were used in committing the homicide. Arrested while on his way, with other relatives, to attend his father's funeral, John Lahnala was informed against for the murder of his father, put upon his trial on February 15, 1915, and, after 20 days of investigation, a verdict of guilty of murder in the first degree was returned by the jury. He was sentenced to imprisonment for life. A new trial was refused.

In this court the record presented is certified as containing, in substance, all of the testimony "introduced in the case that is necessary to present the questions of law raised by this bill of exceptions and assignments of error accompanying the same." The assignments of error number 169. Such as are relied upon are discussed by respondent's counsel as presenting 29 questions.

A number of the questions may be properly disposed of without much discussion. No exception is found in the record as a basis for the second assignment of error, upon which the first question is raised. If it were otherwise, it would be assumed that after the preliminary examination of the witness by respondent's counsel, no further objection being made, no use was made of the memorandum by the witness which counsel regarded as improper. If the question was open, it would be necessary to consider whether a statement, or statements, consisting only of the answers made to interrogatories ought ever to be received as a confession or admission of a person accused of crime. Usually a question colors and gives meaning to the answer made to it.

It was not error to admit in evidence the gun owned by respondent. That he owned it and might have used

it does not prove that he did use it, or any weapon, to kill his father. But a case must be made piecemeal. It was not error to acquaint the jury with the fact that such a gun was designed to fire such cartridges as were apparently used by the guilty person, and to explain why such cartridges could not be used in the ordinary revolver.

As the record was made, the case could not properly have been withdrawn from the consideration of the jury. Nor was it error to instruct that the testimony was of such a nature that if the respondent did the killing he was guilty of murder in the first degree. The requests to charge preferred by respondent which ought to have been given were given, in form or in substance. The charge was an admirable one, open to no serious criticism. There are, however, some errors assigned which demand a more extended consideration. They challenge rulings admitting testimony tending to prove a motive for the commission of the crime, and tending to prove that respondent might have committed it—that he was in the vicinity; they challenge an examination and impeachment of respondent's mother; they challenge, some of them, the method of producing to the jury the testimony of witnesses taken upon the preliminary examination. They cannot be considered without a somewhat extended reference to the record.

Respondent was a witness in his own behalf, and not only denied having committed the crime, and denied that there existed any reason or motive for committing it, but his own and the testimony of others tended to prove that he was not in Houghton, or Hancock, or at his father's farm, on September 4th or 5th, but was at a distant point, in Marquette or in Alger county, when the crime was committed. I use the names of both counties, not because respondent's testimony was

uncertain, but because I cannot always fix the described location by county lines.

I have said that it was undisputed that respondent was at Swanzy in the afternoon of Friday, September 4th. He was at his brother's home on Sunday, September 6th. His movements Friday evening and on Saturday are therefore of large importance. Four witnesses were produced by the prosecution, a young man and three young women, who testified that they saw respondent in a candy store in Houghton between 8:15 and 8:30 p. m. Friday evening. There is no testimony of any witness who saw respondent on the railroad train, or saw him get off the train. The candy kitchen referred to is a public place, where ice cream is served, and the witnesses were there seated at a table in the rear to be served with ice cream. The witnesses had known respondent. At some time while they were there one of them (according to the testimony) recognized John Lahnala. She described his dress; said that he bought something, apparently, at the candy counter, and left the place. She was asked this question:

"*Q.* I will ask that while John was in there, or immediately thereafter, you made any remark to any of your three companions as to who you had seen."

She answered:

"Just at the time, not after he left, but just as he was leaving.

"*Q.* What remark, if any, did you make to any one of your three companions just as John was leaving?

"*A.* Just as he came in and just as I noticed him, I told the girls, 'Look at John Lahnala,' and the girls all repeated 'John Lahnala,' and that was all."

The young man testified that he did not see respondent, whom he had known rather casually, until the remark, "There is John Lahnala," was made, when he turned his head, "noticed him there, and I was satis-

fied it was John. I didn't pay any more attention than that to him."

Another of the party testified that her attention was attracted by the remark above quoted, when she looked and saw respondent, and that she made a remark. Asked what her remark was, she answered "that it was John." The fourth member of the party testified that her attention was attracted by the same remark. No one is produced who claims to have seen respondent after he left the candy kitchen Friday evening, September 4th, before 8 o'clock the next morning, at or about which hour John Webber, who operated a ferry, testified that he rowed a man across the lake from the Houghton to the Hancock side. This witness testified that he knew respondent, had no talk with him, and that when the boat reached the shore on the Hancock side the man "ran up the hill and ran down the road, ran as far as I could see him." The next time he saw him was in justice's court after his arrest, or, at any rate, after he was in custody. On cross-examination this witness testified:

"*Q.* That on the morning of the 5th, between 8 and 9 o'clock, a fellow asked you to row him across the lake?

"*A.* Yes.

"*Q.* And he had his face blackened up?

"*A.* Yes.

"*Q.* And he got in the boat, and you rowed him across the lake?

"*A.* Yes.

"*Q.* And the only means you had of distinguishing him from some other person was the back of his neck and his ears wasn't black?

"*A.* Yes.

"*Q.* And you had never seen Lahnala but three or four times?

"*A.* Yes.

"*Q.* And from what you saw of him at that time, without speaking to him, you formed an opinion that it was John Lahnala; is that right?

"*A.* Yes.

"*Q.* And the officers came and talked to you?

"*A.* What?

"*Q.* And they confirmed your opinion, didn't they?

"*A.* Yes, sir.

"*Q.* Now, at the time that you formed the opinion that it was John was the time the officers came to talk with you, wasn't it?

"*A.* Yes, sir.

"*Q.* At the time you rowed him across the lake you didn't think anything about it, did you, John?

"*A.* No.

"*Q.* And you told Barney and myself that he was so blackened up that you couldn't tell who it was?

"*A.* Yes."

Two witnesses, a barber and his wife, testified that between the hours of 9 and 10 a. m. Saturday a man whom they did not know called at the shop in Hancock and asked for and purchased a mustache, paying 25 cents for it. After his arrest they saw respondent and were of opinion that he was that man.

A woman witness, who had been a schoolmate of respondent, testified that on the evening of Saturday, September 5th, she was at home about a mile from the Lahnala house and saw respondent passing by in the road. She says she was standing near the gate, inside the fence, a few feet from the traveled way, when her attention was attracted by some person coming from the direction in which Lahnala lived, walking fast. "He was running. That attracted my attention first. Then when he noticed me he stopped" and "walked very fast past me." After passing her, he ran. It was between 8 and 9 o'clock. Most of the witnesses testifying upon the subject say that the night was dark, and one, at least, that it was very dark. The witness testified that she could not tell whether respondent's face was blackened, or whether he wore a mustache. Neither said anything. Respondent did

not look at her. But she described the clothing worn by the person she saw.

I have referred to all of the testimony of witnesses who claim to have seen respondent in Houghton or Hancock, or the vicinity, on Friday or Saturday. To make it more probable that he was there, the prosecution produced a railroad ticket, and freight clerk who went on duty on the evening of September 4th at 7 o'clock, and went off duty at 3 o'clock the next morning. He testified that a train from Calumet for Nestoria and points east left Houghton at 10:55 that evening. The train arriving at Houghton from Marquette, due at Houghton about 8 o'clock p. m., arrived while the witness was on duty, but whether on time or not he could not state without reference to the train register, which register was offered and received in evidence, and from which it appeared that the conductor of the train reported the train at Houghton at 8:09 p. m., 14 minutes late. It is conceded that it was error to admit the register in evidence. See *People* v. *Dow,* 64 Mich. 717, 721 (31 N. W. 597, 8 Am. St. Rep. 873); *People* v. *Goodrode,* 132 Mich. 542, 547 (94 N. W. 14). But it is said that it was error without prejudice, because it is established otherwise that respondent was in Houghton during the evening between 8:15 and 8:30 p. m., and the jury have so determined.

The positive character of the testimony of some of the witnesses who say they saw respondent at Houghton is rather shaken by cross-examination and opposed and contradicted by testimony of statements made by some of them. It is to be considered, in respect to this branch of the case, whether in admitting testimony of the first and succeeding exclamations of the witnesses who were in the candy kitchen, and in admitting the train register in evidence, reversible error was committed.

In seeking to prove a sequence of facts, the estab-

lishment of any one of them often aids in establishing the others. The average mind will require less proof of a fact which naturally follows another established or admitted fact. So an apparent agreement of several persons that a fact exists gives some additional weight to the testimony of each of them when they later testify to personal knowledge of the fact. Whether any of the four witnesses who stated that he or she saw respondent in the candy kitchen actually saw and recognized him is of peculiar importance. Whether the recognition was casual and uncertain, three observers accepting in part the exclamation, or statement, of the fourth, they having no interest in the matter and no reason for testing the truth of the exclamation or statement, is also of peculiar importance. The testimony of the exclamations was not used to identify an occurrence or that a particular thing happened at a particular time; the time being fixed in the memory of the witness by a remark. *Cole* v. *Railway Co.*, 105 Mich. 549, 550 (63 N. W. 647). The vital question to each witness was not whether he or she remembered that they saw Lahnala *on a particular occasion,* but was whether he or she *did see and identify him upon an occasion which was fixed.* The effect was to sustain the testimony of each witness by proof of an exclamation or of exclamations, showing that at the moment there was apparently a concurrence of opinion as to the identity of the person observed, showing also that at the time each witness announced the identity of the person observed. It was as though each had said, "I know it was the respondent because I said so at the time." In *People* v. *Eagle,* 189 Mich. 404 (155 N. W. 460), testimony similar in character was held to have been erroneously admitted. See, also, *People* v. *Mead,* 50 Mich. 228 (15 N. W. 95) ; *Brown* v. *People,* 17 Mich. 429 (97 Am. Dec. 195). If respondent was in Houghton Friday evening, it is more

probable that Webber ferried him across to Hancock, more probable that he was seen in the barber shop, and that the young woman was not mistaken in saying that she saw him coming from his father's on Saturday evening, in the dark. If he was not seen in the candy kitchen Friday evening, all other testimony connecting him with the crime must at once be subjected to a new test before all reasonable doubt is removed.

Mrs. Matilda Lahnala was called by the people. This they were bound to do, since she had knowledge of facts—the return of her husband on the night he was killed and what she knew of his movements—connected with the homicide, and was the first one to see and touch his body after the shooting. As to all of these matters she gave her testimony, and no one disputes it. She was then interrogated upon direct examination. upon other subjects, and among them as to whether she had a certain conversation on October 18th (after the shooting) with Robert Kuru. Having stated that respondent was not present, and objection having been made, the court inquired the purpose of the examination, to which the prosecuting attorney replied:

"It's for the same purpose, your honor, that I question relative to the telephone, simply to the matter of interest, showing interest and bias in this case, and for the purpose of refreshing her memory as to past events, and for the possible purpose of impeachment on the material issue."

The objection being overruled, the examination proceeded as follows:

"Q. Did you have a talk with Robert's mother?
"A. Yes.
"Q. Did you not have a talk with Robert and his mother together?
"A. No.
"Q. I will ask you if you didn't say to Robert in the presence of his mother that you wanted to say something to him that you didn't want to say in the presence of his mother.

"*Mr. Burritt:* Now, if the court please, we object to that as incompetent, whether this witness did or did not make such a statement as contained in the question of the prosecuting attorney.

"*The Court:* I have heard the question, and I will overrule the objection.

"*Mr. Burritt:* I would like to have the question read again and give me an exception. (Last question read.)

"*Mr. Burritt:* Give me an exception to the ruling of the court.

"*A.* No.

"*Q.* I ask you if you did not at that time, not in the presence of Robert's mother, but to Robert, ask that he should go to the office of Burritt & Burritt, in Hancock, and tell them that he was the person who ran along the Oskar road past the Uusitala home on the evening of September 5, 1914, shortly after 8 o'clock.

"*Mr. Burritt:* We object to that, if your honor please, as incompetent and immaterial. It doesn't tend to prove or disprove the point in issue. It doesn't make any difference whether the witness made such statement or such request to the man Kuru or not. It can't affect this defendant unless they connect him with it in some way directly.

"*The Court:* It need not be directly.

"*Mr. Burritt:* He has got to be connected.

"*The Court:* I will overrule the objection. If he is not connected with it it will be stricken out.

"*Mr. Burritt:* Note an exception.

"*A.* No."

Continuing his examination of Matilda, the prosecuting attorney was permitted to elicit the following:

"*Q.* Do you not recall that in the summer of 1912 Eiono and his wife visited your place, and that August and Eiono went in the field, and that you and John and Eiono's wife had some talk in the kitchen?

"*A.* I don't remember.

"*Q.* Do you not recall that at this time you were cooking dinner, and that while cooking dinner you were telling about the trouble between John and his father? (Last question read. Objected to as incom-

petent, remote, and immaterial. Overruled. Exception.)

"*A.* They never had any bad trouble between them.

"*Q.* Will you answer the question? (Question repeated.)

"*A.* No.

"*Q.* Did you not then, in the presence of John, say to Eiono's wife, 'Willie is too easy with his father, and John is the boy that will kill him if he doesn't mend his manners'?

"*The Court:* The question is so obviously admissible there isn't any reason of objection till it's over.

"*Mr. Burritt:* I take exception to the ruling and statement of the court. (Last question read.)

"*A.* Never.

"*Q.* Did not John at this time get up from the chair where he was then sitting and say, 'If he doesn't change his ways I will—' and then leave the room without finishing his sentence?

"*A.* That isn't true."

Upon each of these points the prosecuting attorney was permitted to call witnesses in impeachment. In impeachment Mrs. Kuru said:

"*A.* I don't remember the talk had in the kitchen. I went outside to get the milk cans that were on the steps. Mrs. Lahnala followed me to the steps. She said that, 'I would like to talk to your boy, Robert, but I hardly can.' I asked her what she wanted to talk to him about.

"*Q.* And what was her answer?

"*A.* If he wouldn't go and tell Burritt & Burritt that he was the one that ran along the road here. This was not said in the presence and hearing of Robert. He went past to get some wood. She did not go to Robert and talk with him; she had a talk with Robert. I don't remember whether before she told me what she wanted she asked if Robert had run along the Oskar road on the evening that Mr. Lahnala was killed. That wasn't all of her conversation that I related a little while ago. * * * I then told her that he can't go and lie that way. He hadn't been there all day; he had been in another direction.

"*Q.* And what did she say to that?

"*A.* She said, 'You need not be afraid of that; one can't lose by it.' The boy came there then. He had an armful of wood. I told her that there was the boy, and then there is that which she said to the boy, 'Won't you go and tell Mr. Burritt that you were the boy who ran along the Canal road on your errands?' "

Robert testified:

"*A.* Yes; Mrs. Lahnala said, 'Won't you go to Mr. Burritt and tell him that you are the man who ran along the Oskar road that night in this direction?' I said I wouldn't go; that I hadn't been to Oskar all day."

On cross-examination:

"I don't know how Mrs. Lahnala happened to come to my house. I don't know whether my mother sent for her. Willie Lahnala was there to see me the day before. He said, 'Were you the one that was at Oskar that evening?'—the evening that the old man was killed, he said. He asked me whether I passed the Uusitala house the night his father was killed. I told him that I hadn't passed it. Willie was there to see me the same day Mrs. Lahnala was there; it was the same day. This is the last time I ever talked with either of them.

"*Q.* Didn't Mrs. Lahnala tell you that she heard that you went by the Uusitala house on the night of the 5th?

"*A.* I can't remember.

"*Q.* Didn't she tell you that if you did, and if you would go over to Burritt & Burritt's office and see them and make an affidavit to the effect that you did go by there, she would like to have you do so, and Burritt & Burritt would pay you for your trouble?

"*A.* She asked me, but she didn't say anything about being paid for the trouble.

"*Q.* Mrs. Lahnala said to you, in substance, that if you went by the Uusitala house on the night of September 5th, she would like to have you go over to Hancock to Burritt & Burritt's office and make an affidavit to that effect, or statement, see Burritt & Burritt, didn't she?

"*A.* No.

"*Q.* Well, what did she say to you?

"*A.* I can't remember what she said.

"*Q.* She said if you went by there she would like to have you come over to Hancock to Burritt & Burritt's office, didn't she?

"*A.* She said wouldn't I go to Burritt & Burritt's office.

"*Q.* She asked you if you wouldn't go to Burritt & Burritt's office and say to them that you went by the Uusitala house on the night of September 5th, between 8 and 9 o'clock?

"*A.* Yes.

"*Q.* She didn't say anything about paying for your trouble?

"*A.* No."

As to the other alleged conversation had in 1912, the impeaching witness testified as follows:

"Mrs. Lahnala said, 'There is a man, he will keep hired men to do the work and pay them, and he cannot keep his own children at home and get along with them like other people.' She said that 'he has work done by outsiders, can't get along with his own, and can't give decent words, especially so with Willie, because he is such a soft-natured fellow, never opposed him in anything.'

"*Q.* Go on.

"*A.* Pointing toward John, 'But there is a boy that he can't prod much.'

"*Q.* Go on.

"*A.* 'That he would just as lieve kill if he should become angry.' And then she said, 'And what of it if he should kill?'

"*Q.* What, if anything, did John then say?

"*A.* I said that 'That's too strong.' John said, 'Why should he be that way.'

"*Q.* Go on.

"*A.* John went out.

"*Q.* Was that all of the conversation at this time?

"*A.* There was no further talk. Then at the time that Mrs. said, 'What if he should be killed?' she threw potatoes into the kettle just at that time so that the water squirted up and splashed on the stove.

"*Q.* Did you ever hear any words between John and his father?

"*A.* No.

"*Q.* Did you ever hear John make any threats of what he would do to his father?

"*A.* I have not talked with him much.

"*Q.* Did John say anything else in the kitchen than you have already stated?

"*A.* No; he didn't say anything.

"Defendant moved to strike the testimony out as incompetent and immaterial. The point we make is any feeling Mrs. Lahnala may have had against her husband and anything she may have said concerning her husband cannot be charged up to this boy."

The people having rested, and several witnesses having been sworn for the respondent, counsel for respondent announced that he recalled Matilda, to which the prosecuting attorney objected, and the court ruled that, if she was called, it must be as a witness for the respondent for direct examination, to which ruling an exception was taken. Having been so reintroduced as a witness in the case, she testified, in substance, that Mrs. Kuru told her that she thought it might have been her son Robert who was seen running along the Oskar road on the night the murder was committed; that counsel for the respondent advised her to inquire into the matter; that she had no conversation with the son Robert, but only with his mother. She denied the statement which was attributed to her by the witness Vetriga Lahnala (Eiono's wife), and was then cross-examined at length by the prosecuting attorney, going over the same subjects, after which she was asked:

"*Q.* And were you satisfied to have John leave home? (Objected to as immaterial. Objection overruled. Exception.)

"*A.* I would have liked to have him at home. I have testified that John left because he couldn't get what he thought was proper clothes.

"*Q.* And you did think that it was not right that one of the boys, one of your boys at that age, should have to go away from home to work when the father was hiring help on the farm? (Objected to as irrelevant and immaterial. Objection overruled. Exception.)

"*A.* I have never said anything about that.

"*Q.* I didn't ask you what you said. I asked you what you thought.

"*Mr. Burritt:* We renew our objection as to what this woman thought as irrelevant and immaterial to this issue. (Objection overruled. Exception.)

"*A.* About what? (Last question read.)

"*A.* Because his father wouldn't give him any clothes he had to go away and earn money to get clothes.

"*Q.* And you thought that it wasn't right that he had to go away and earn money to get clothes? (Objected to as irrelevant and immaterial. Objection overruled. Exception.)

"*A.* I was just lonesome for the boy when he left.

"*Q.* And didn't you say, while you were talking to Mrs. Vetriga Lahnala in your kitchen, just exactly what Mrs. Vetriga Lahnala testified to, namely, 'That here is a man, August, that hires help and can't keep his own boys at home at work?'

"*A.* I haven't said anything like that. I don't remember of having said anything like that ever.

"*Q.* You want to testify now that you did not say what Mrs. Vetriga Lahnala has here testified you did say in your kitchen in the presence of John?

"*A.* I don't remember; I can't remember; I can't remember. I don't remember the conversation at all.

"*Q.* And you will not testify, then, that you did not have the conversation?

"*A.* I don't remember the talk at all. I don't remember. On our farm there are four 40's. Two 40's we have had for 27 years. The 40 the house is on and the other 40 is corner. We have had the third 40 nearly 20 years; the fourth 40, the farthest away from the house, about 10 years. That's the cow pasture. The 40's on which the house stands, one is east of Canal road and one west.

"*Q.* Whom do you consider owned the two 40's on

which the house stood at the time August was killed?

"*Mr. Burritt:* I object to that as incompetent. The fact as to whom she considered owned the land is incompetent and immaterial.

"*The Court:* This is only admitted as bearing upon her motives and credibility, etc., and I think I will overrule the objection. (Exception.)

"*A.* They all belong together."

As to the testimony of the interview of Matilda with the Kurus, mother and son, it was immaterial; respondent being in no manner connected with it. As to the impeaching testimony given by Robert and his mother, it was incompetent, because the testimony of Matilda was immaterial. The testimony was harmful to respondent, not alone because it was either merely immaterial or incompetent. This and other testimony with respect to which she was contradicted, and the final cross-examination of Maltida introduced into the case an apparent issue between the people and the witness, and the witness and the respondent were by suggestion and by inference made to stand together. The very statement of counsel for the people in offering the testimony of Matilda contained the suggestion. If the false issue was determined by the jury favorably to the people, respondent was correspondingly affected. The jury may have believed the Kurus and Mrs. Vetriga Lahnala and have believed that Matilda's purpose in interviewing the Kurus was sinister, although she says it was innocent. They may have believed that she hated her husband and was prepared to uphold her son in taking his life; that she, in effect, counseled such a course.

With respect to the impeachment of witnesses whom the people are obliged to call by the people, the rule is stated in *People* v. *Elco*, 131 Mich. 519 (91 N. W. 755, 94 N. W. 1069), where the subject is exhaustively reviewed. See, also, *People* v. *Miner*, 138 Mich. 290

(101 N. W. 536). Upon the authority of that case the impeaching testimony should have been excluded. The danger in any case is that not the sworn testimony given in court, but the unsworn, extrajudicial statements made by witnesses will be used to convict a respondent. The court advised the jury that the purpose of the examination and of the impeaching testimony was to affect the credibility of Matilda, and that it and similar testimony was not received and was not to be considered as substantive evidence of the guilt of respondent. But the credibility of Matilda in giving material testimony was not attacked. It was about immaterial things that the issue of her credibility, her bias and interest, was introduced into the case. What has been said upon this subject applies to the testimony of Matilda and the contradicting testimony, she being asked if she had told a certain person that her son was at work for the railroad company. Suppose that she lied about it. Respondent is not to be convicted because of her statements nor upon the suggestions which they give rise to. If it was believed that the mother was an accomplice of the son, she could have been charged as such. But to suggest her complicity, as some of the questions asked her plainly did, without asserting it, and to contradict her upon immaterial matters, was a course calculated to do respondent great harm.

It was error, not reversible error in view of other testimony, to prove the sale of the automatic gun, in evidence, to the brother of respondent by the record of the sale; neither the sale nor the record having been made by the witness. The same is to be said of the introduction in evidence of the record of the telephone company.

Concerning the transcripts of testimony of certain witnesses, which were received in evidence, it is to be said that the use made of them by counsel does not

appear. No opinion should be expressed upon the question presented, because whether what was done was reversible error depends, of course, upon what was done with them, what use made of them.

Wholly apart from the testimony I find objectionable, there was testimony requiring the case to go to a jury. Our attention is directed on the part of the people, among other reasons for denying a reversal of the judgment, to one based upon Act No. 89, Pub. Acts 1915 (3 Comp. Laws 1915, § 14565), which provides that no judgment or verdict shall be set aside on the ground of improper admission or rejection of evidence unless, in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. Without attempting an interpretation of the law or deciding whether in any case the justices should or will act in the capacity of jurors, I find in this case prejudicial error in admitting testimony calculated, notwithstanding the advice of the trial court to the jury, to induce the conclusion of fact which was reached when, if it had been excluded, a different conclusion might have been reached. In my opinion, that is, and must always be, a miscarriage of justice.

For the errors pointed out, the judgment is reversed, verdict set aside, and new trial granted. Respondent will be delivered into the custody of the sheriff of Houghton county to be dealt with according to law.

STONE, C. J., and BIRD and PERSON, JJ., concurred with OSTRANDER, J.

MOORE, J. I agree with Justice OSTRANDER there was prejudicial error.

KUHN, BROOKE, and STEERE, JJ., concurred with MOORE, J.