PEOPLE v JENKINS

Docket No. 96832. Argued March 7, 1995 (Calendar No. 3). Decided
August 22, 1995. Rehearing denied *post,* 1212.

Steven J. Jenkins was convicted by a jury in the Detroit Record-
er's Court, Edward M. Thomas, J., of assault with intent to
commit murder and possession of a firearm during the commis-
sion of a felony. During trial, the prosecution, over objection by
the defense, was permitted to impeach its own witness by
having the content of the witness' prior inconsistent statement
to the police read into evidence. The Court of Appeals,
SHEPHERD, P.J., and BRENNAN and L. P. BORRELLO, JJ.,
affirmed in an unpublished opinion per curiam (Docket No.
128467). The defendant appeals.

In an opinion by Justice LEVIN, joined by Chief Justice
BRICKLEY, and Justices CAVANAGH and MALLETT, the Supreme
Court *held:*

The trial court erred in allowing the impeachment of a
prosecution witness by permitting a police officer to read verba-
tim from a memorandum of the witness' prior statement to the
police under circumstances creating an unacceptable risk that
the jury would accept its contents as substantive evidence. The
memorandum contained prejudicial statements serving no
proper impeachment purpose.

1. The trial court did not err in allowing the prosecutor to
impeach the witness, although it did so for the wrong reason.
Instead of permitting the impeachment under the mistaken
impression that the prosecution was obliged to call the witness
as a res gestae witness, it should have permitted impeachment
under MRE 607 as testimony unexpected and actually injurious
to the prosecution's case.

2. The prosecutor properly laid the foundation to impeach
the witness with extrinsic evidence contained in a written
memorandum of prior inconsistent oral statements to the po-
lice. Because a written memorandum of an oral statement itself
is hearsay, allowing the impeaching witness to read from the
written memorandum of the statement constitutes the admis-
sion of hearsay, unless a proper foundation is laid for admission
as past recollection recorded. The written statement signed by
the witness was not admissible simply because it was signed.

Appropriate portions would have become admissible during the testimony of the officer, and then only as past recollection recorded, which the prosecutor acknowledges was not the basis on which admission was sought.

3. Authentication is the process of determining that the piece of paper offered as evidence is what the officer wrote down when interviewing the witness. In contrast, the hearsay problem arises because the memorandum is the officer's out-of-court statement that he wrote what the witness actually said. The accuracy of the report contained in the memorandum and a hearsay exception could only have been established by the officer having testified from memory, refreshed memory, or, if a proper foundation had been laid, on the basis of past recollection recorded. Absent such a foundation, the word-for-word recital of the witness' responses was hearsay, even though the witness acknowledged making the statement and having signed it. But even if the reading of the written memorandum did not represent an independent level of hearsay, the court abused its discretion in permitting the officer to read from the memorandum of the witness' statement under circumstances creating an unacceptable risk that the jury would accept the contents of the memorandum as substantive evidence. Moreover, the memorandum contained prejudicial statements serving no proper impeachment purpose.

4. Because the inconsistent statement is not substantive evidence, it could only be used for impeachment purposes. Where an inconsistent statement in a writing contains other prejudicial information, only the portion containing the inconsistent statements should be admitted. The admission of the entire statement was unnecessary to achieve this end, serving only to impermissibly provide inculpatory testimony to bolster the relatively weak identification testimony of but one witness, whose integrity was put in question by another witness. The concern that the jury accepted the prior statement as substantive evidence is heightened by the lack of a limiting instruction to the jury when the officer read the statement. The court should have told the jury at that time that it was only to consider the testimony for impeachment purposes.

Reversed and remanded for a new trial.

Justice RILEY, joined by Justices BOYLE and WEAVER, dissenting, stated that it was not error to admit the officer's testimony regarding the witness' prior statement, because the statement, signed and adopted by the witness when given to the officer, was used solely to impeach the witness at trial and therefore was not hearsay. The witness' in-court testimony contradicted

his earlier statement and, as a result, was unanticipated and injurious to the prosecution. Consequently, the prosecution properly could impeach him with his statement under the then-existing version of MRE 607(2)(C). Regardless of whether the prosecutor, at the time of trial, had a right to impeach the witness, he would have a right in a new trial under the current version of MRE 607, which provides that the credibility of a witness may be attacked by any party, including the calling party. Consequently, if a new trial were to be ordered, the prosecution could freely impeach the witness about this matter.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training and Appeals, and *Carolyn M. Breen,* Assistant Prosecuting Attorney, for the people.

*Arthur Lee Morman* for the defendant.

LEVIN, J. Steven Jay Jenkins was convicted of assault with intent to commit murder[1] and possession of a firearm during the commission of a felony.[2] The Court of Appeals affirmed.[3] This Court granted leave to appeal, limited to the issue "whether the Recorder's Court erred in permitting the impeachment of witness Pennington and the testimony of witness Gale."[4] We reverse and remand for a new trial because we conclude that the Recorder's Court did so err.

I

This appeal arises out of a drive-by shooting in

[1] MCL 750.83; MSA 28.278.
Jenkins was acquitted of a charge of first-degree murder. MCL 750.316; MSA 28.548.
[2] MCL 750.227b; MSA 28.424(2).
[3] Unpublished opinion per curiam, issued April 29, 1993 (Docket No. 128467). The Court of Appeals remanded for resentencing.
[4] 445 Mich 908 (1994).

February, 1989, of Demowens Harris who was killed by automatic gunfire from a passing automobile as he walked down the street with Emanuel Pride and Carlos Brunner.

Pride testified that Jenkins was the gunman, and had fired shots from the passenger seat of a gold or brown automobile.[5]

Shortly after the shooting, Reginald Pennington gave police a signed statement that immediately before the incident he had seen Jenkins riding in a gold Sunbird toward the crime scene, and that gunfire erupted immediately after the vehicle left Pennington's line of sight.[6] Called as a prosecution witness, Pennington offered little useful information. He testified rather that he was sitting on his porch a block away from the crime scene when he heard shots and saw a crowd gather.

The prosecutor asked Pennington whether he had seen Jenkins on the day of the shooting before he heard the gunshots. He responded, "[a]bout an hour before that," "[d]own on Oakland." Jenkins drives a grey truck. He had seen him in a gold Sunbird on a number of occasions. He did not see the gold Sunbird going past his house before he heard the shots. Asked whether he saw Jenkins in the gold Sunbird that day, he responded, "I don't remember."

When cross-examined concerning his prior statement, Pennington became evasive. He acknowledged giving a statement to Sergeant Ronald D. Gale, but denied seeing "him," presumably Jenkins, in "a gold Sunbird just before [he] heard the shots." He was given an opportunity to read the

---

[5] Brunner testified that he could not identify the gunman, and that he thought the gunman fired from a burgundy-colored Shadow or a Laser.

[6] Pride described the vehicle as a Skylark.

signed memorandum of the statement, but claimed it did not refresh his "memory at all as to having seen Steven Jenkins in a gold Sunbird shortly before the gunshots were heard." Over defense objections, the prosecutor impeached Pennington by asking whether he made various statements incriminating of Jenkins set forth in the memorandum. He was asked whether he told Sergeant Gale that he saw Jenkins in the passenger seat in the gold Sunbird, and responded "I don't think so." He acknowledged reading the statement before signing it. He did not remember telling Gale that he saw Jenkins in the front passenger seat. Nor did he remember telling Gale that he heard about eleven shots. He suggested that he "probably was intoxicated on drugs on that day."

He remembered giving the statement and signing his name, and, in response to the question "now, today, you remember nothing?" he responded, "right." He said that drugs caused his memory to fade.

Over defense objections, the prosecutor questioned Sergeant Gale, the police officer who took Pennington's statement. The prosecutor had Gale read much of Pennington's statement. Gale quoted Pennington as saying:

"At about 6 P.M., I'm sitting on the porch of 102 Leicester. A gold Sunbird rode past the house, and as soon as it got out of my eyesight, I heard the shooting. *One of my friends came around there where I was at and told me that Steve [Jenkins] had shot [the victim] Demowens in the head.* Steve [Jenkins] is the one that drives the gold Sunbird." [Emphasis added.]

The foregoing quoted words were read word for word from the memorandum of the statement

given by Pennington to Gale. The prosecutor led Gale through the memorandum of the statement.[7]

Gale was permitted to read word for word from the memorandum, "I saw the driver of the car and the passenger. I didn't see who was in the back seat of the car." He recognized in the car "Steven Jenkins and this guy named Spanky." Jenkins was "[i]n the front passenger side." Spanky "was the driver of the car." He heard "[a]bout 11" shots fired. Gale also asked Pennington whether he had ever seen Jenkins with a gun before, and Pennington responded, "Yes, a .45 automatic, nickel-plated." "Every time [Jenkins] gets out of the car to go in that building, he has the gun in his hand."

Gale further testified that Pennington did not appear intoxicated when giving the statement, and that Pennington had signed the memorandum of the statement.

II

The trial judge did not err in allowing the prosecutor to impeach Pennington, although he so ruled for the wrong reason. The judge permitted the impeachment under the mistaken impression that the prosecutor was obliged to call him as a res gestae witness. The Court of Appeals recognized that the statute,[8] had been amended by 1986 PA 46 and no longer requires a prosecutor to produce res gestae witnesses at trial.[9] The Court of

---

[7] Did you ask him, sir—I'm now on the second page, in the middle of the page—how many shots he heard?

*  *  *

And toward the bottom of the page, sir, did you ever ask him if he had ever seen Steve with a gun before?

[8] MCL 767.40a; MSA 28.980(1).

[9] The pre-1986 version of the statute provided: "[w]itnesses whom

Appeals affirmed the decision as a valid exercise of discretion under the amended version of the statute.[10]

At the time of trial,[11] MRE 607 barred the prosecution from impeaching its own witness unless (a) the prosecutor was obliged to call the witness, or (b) the witness' testimony was unexpected and "actually injurious" to the prosecution's case.[12]

Pennington's testimony that he saw nothing important was "actually injurious" to the prosecution.[13] It cost the prosecution eyewitness testimony placing Jenkins at the scene of the crime. Further, there is no indication that the prosecution expected Pennington to change his story.[14]

the people are obliged by law to call as res gestae witnesses may be impeached the same as though such witnesses had been called by the respondent."

[10] The statute as amended by 1986 PA 46 provided that "[a]ny party may within the discretion of the court impeach or cross-examine any witnesses as though the witness had been called by another party." MCL 767.40a(6); MSA 28.980(1)(6).

[11] MRE 607 was amended after Jenkins' trial. The rule now provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness."

[12] MRE 607 provided at the time of trial:

Who May Impeach

The credibility of a witness may be attacked by

(1) an opposing party; or

(2) the calling party if

(A) the calling party is the prosecutor and he is obliged to call the witness . . . or

(C) the witness's testimony was contrary to that which the calling party had anticipated and was actually injurious to the calling party's case.

[13] See, e.g., *People v Case,* 105 Mich 92, 98; 62 NW 1017 (1895); *People v White,* 401 Mich 482, 509; 257 NW2d 912 (1977), stating that the purpose of the rule is to allow a party to show the jury why the witness was called; *People v Medina,* 100 Mich App 358, 363-364; 298 NW2d 648 (1980).

[14] Cf. *White,* n 13 *supra,* pp 509-510.

III

The prosecutor properly laid the foundation to impeach Pennington with extrinsic evidence—Sergeant Gale's testimony—by showing Pennington the signed memorandum of his statement and asking him if he remembered making it.[15] Pennington admitted making the statement, but claimed not to remember telling the police he had seen Jenkins in the automobile.

When a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement.[16] The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement.[17]

A

Because a written memorandum of an oral statement is itself hearsay, allowing the impeaching witness to read from the written memorandum of the statement constitutes the admission of hearsay, unless a proper foundation is laid for admission as past recollection recorded.[18] As stated in *People v Rodgers,* 388 Mich 513, 519; 201 NW2d 621 (1972), the impeaching witness is not relating what he heard, but offering "an extrajudicial statement . . . to prove the truth of the thing said (that [the impeached witness] had spoken the

[15] MRE 613(b).

[16] *Hill v Harbor Steel & Supply Corp,* 374 Mich 194, 215; 134 NW2d 54 (1965); 2 Torcia, Wharton's Criminal Evidence (14th ed), § 434, pp 749-750.

[17] *People v Rodgers,* 388 Mich 513, 519; 201 NW2d 621 (1972). The prosecutor's method of impeachment in *Rodgers* resembled the method employed here. *People v Rodgers,* 36 Mich App 211, 222-223; 193 NW2d 412 (1971).

[18] *Rodgers,* n 17 *supra,* 388 Mich 519.

words imputed to him)."[19] Gale's reading of the statement was such hearsay.[20]

The dissent would distinguish *People v Rodgers* on the basis that Pennington signed the statement in contrast with witness King, in *Rodgers*, who did not, and would overrule *Rodgers*.

If a question were to have arisen whether Gale accurately recorded Pennington's responses to the officer's questions, Pennington's signature would have been probative that the questions and responses were accurately recorded. But the written statement signed by Pennington was not admissible in evidence simply because it was signed. Appropriate portions would have become admissible on the testimony of Gale, and then *only* as past recollection recorded, and the people acknowledge that they did not seek to have it admitted on that basis.[21]

As set forth in *Rodgers,* Gale could have testified

---

[19] *Id.*

[20] Testimony of "the impeaching witness presenting extrinsic proof should state the time, place, circumstances of the statement and the subject matter of the statement but not its content." 28 Graham, Federal Practice & Procedure (interim ed), § 6583, pp 191-192, discussing FRE 613(b).

The dissent refers to Graham, *Impeachment of witness—Prior inconsistent statements,* 21 POF2d 101, 140-144. *Post,* p 274. The recital at the referenced pages does not indicate what exception to the hearsay rule is being invoked. See MRE 803(5) concerning recorded recollection.

[21] The dissent mistakenly argues that because Gale's memorandum purports to be a verbatim report of what Pennington told Gale, the memorandum poses no hearsay problem. The allegedly verbatim memorandum is still Gale's out-of-court written statement that Pennington said the words reproduced in the written memorandum.

The dissent also fails to distinguish between the different levels of hearsay in this case. If the written memorandum is offered to impeach Pennington, it is still an out-of-court statement offered to prove the truth of the matter asserted. The matter asserted is that Pennington uttered the words on the page. In contrast, if the memorandum were offered as substantive evidence, it would present an *additional* level of hearsay because it would be offered to prove (1) that Pennington said the words on the page, and (2) that those words were true— Jenkins was in a gold Sunbird near the crime scene.

from memory about what Pennington told him. If
he "could not recall the conversation, he could
have been shown the memorandum to refresh his
memory. If he could not then testify without the
aid of the memorandum, [appropriate portions of]
the written memorandum might *then* have been
introduced in evidence [as past recollection re-
corded] and read to the jury provided a proper
foundation was laid." *People v Rodgers, supra,* p
519. (Emphasis added.)[22]

Be that as it may, Pennington testified at the
trial that he had seen the gold Sunbird on prior
occasions more than once, that he had not seen
the gold Sunbird going past the house on the day
of the shooting before he heard the shots, and that
he did not remember seeing Jenkins in the gold
Sunbird that day. That testimony justified the
prosecutor having the officer testify either from
memory, or from refreshed memory, or, if "a
proper foundation was laid," *and it was not,* from
past recollection recorded, that Pennington had
given the officer an inconsistent statement, shortly
after the killing, that he had seen Jenkins in the
gold Sunbird that day.

---

[22] The written memorandum was read to the jury. This consti-
tuted its admission in evidence. This was error. The writing
was prepared by the Detective Taylor, out of court and was not
signed by the witness King. The writing was hearsay. It was an
extrajudicial statement (by Taylor) offered to prove the truth of
the thing said (that King had spoken the words imputed to
him).

There was nothing to prevent Taylor from testifying verbally.
He could have related his conversation with King. If he could
not recall the conversation, he could have been shown the
memorandum to refresh his memory. If he could not then
testify without the aid of the memorandum, the written memo-
randum might then have been introduced in evidence and read
to the jury provided a proper foundation was laid. *Jaxon v
Detroit Dep't of Street Railways,* 379 Mich 405, 413 [151 NW2d
813] (1967).

B

The dissent argues that the verbatim memorandum of Pennington's statement is relevant and admissible to impeach "if properly authenticated" pursuant to MRE 901.[23]

Gale's testimony that Pennington signed the memorandum of the statement Gale had in his hands when testifying authenticated the memorandum as the statement signed by Pennington.[24] Gale's testimony that Pennington signed the memorandum Gale had in his hands when testifying did not establish that the contents of the statement accurately reported Gale's questions and Pennington's responses, and did not obviate hearsay objections to Gale's report of what Pennington said.

The dissent confuses two distinct inquiries. Authentication is the process of determining that the piece of paper offered as evidence is *what Gale wrote down* when interviewing Pennington. In contrast, the hearsay problem arises because the memorandum is Gale's out-of-court statement that *he wrote what Pennington actually said.*

The accuracy of the report contained in the memorandum and a hearsay exception could only have been established by Gale having testified from memory, refreshed memory, or, if a proper

---

[23] (a) *General provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) *Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) *Testimony of witness with knowledge.* Testimony that a matter is what it is claimed to be. [MRE 901.]

[24] Pennington also authenticated the writing as the memorandum that he signed, although he did not remember making statements contained in it.

foundation had been laid, on the basis of past recollection recorded. Absent such a foundation, the word for word recital of Pennington's responses was hearsay, even though Pennington acknowledged making the statement and having signed it.

As set forth in Graham, Handbook of Federal Evidence (3d ed), § 901.0, p 1011, authentication does not eliminate the need to show that the content of the writing is admissible despite the hearsay bar:

> Documents and real evidence once properly authenticated must be offered into evidence. Compliance with the requirement of Rule 901 of course does not guarantee that the documentary, real, demonstrative or testimonial evidence subsequently offered is admissible, for the offered evidence may still be excluded because of some other bar to admission, *such as the rule against hearsay,* lack of relevancy, or Rule 403. [Emphasis added.]

IV

But even if the reading of the written memorandum did not represent an independent level of hearsay,[25] the court abused its discretion in permitting Gale to read from the memorandum of Pennington's statement under circumstances creating an unacceptable risk that the jury would accept the contents of the memorandum as substantive evidence. Moreover, the memorandum contained prejudicial statements serving no proper impeachment purpose.

Pennington did not provide testimony tending in

[25] I.e., if the written memorandum is not viewed as inadmissible despite being an out-of-court statement offered to prove that Pennington uttered the words as there set forth.

any way to exculpate Jenkins. He, rather, disappointed the prosecutor in failing to provide inculpatory testimony. Pennington's inconsistent statement is, I believe we all agree, admissible only to show that Pennington made the inconsistent statement, and not as substantive evidence that Jenkins was in the Sunbird, driving to the scene of the killing shortly before the shots were heard.

Since the inconsistent statement is not substantive evidence, it could only be used for impeachment: to cause the jury to disbelieve Pennington's claim that he did not remember seeing Jenkins in the gold Sunbird on the day of the shooting. The admission of the entire statement, and that is what in effect occurred, was unnecessary to achieve this end. It served only one purpose—to impermissibly provide inculpatory testimony to bolster the relatively weak identification testimony of but one witness, whose integrity was put in question by another witness.[26]

This Court has recognized the danger "that not the sworn testimony given in court, but the unsworn, extrajudicial statements made by witnesses will be used to convict a respondent."[27]

As the United States Court of Appeals for the Fourth Circuit stated:

> We must be mindful of the fact that prior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof. The introduction of such testimony, even where limited to impeachment, necessarily increases the possibility that a defendant may be convicted on the basis of unsworn evidence, for despite proper instructions to the jury, it is often

[26] See *post*, pp 275-277.
[27] *People v Lahnala*, 193 Mich 144, 162; 159 NW 352 (1916).

difficult for them to distinguish between impeachment and substantive evidence.[28]

In this case, where the prosecution presented to the jury a verbatim recitation of damning out-of-court statements by Pennington, special care should have been taken to ensure that "impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible."[29]

Casting doubt on Pennington's testimony by showing that he had made inconsistent statements in the past did not justify Gale reading Pennington's prior statement word for word to the jury. Proper impeachment could have been accomplished by asking Gale to testify from memory whether Pennington reported seeing defendant in the car at that time, and whether he thought Pennington was intoxicated when he made the statement.

The closing arguments further indicate that the prior statement was used as substantive evidence. The prosecutor's initial closing argument did not mention Pennington. In her rebuttal argument, the prosecutor contended that Pennington had lied, and that

> I think this is one of those situations where, yes, it's becoming apparent that things somehow have changed. The passage of time has suddenly changed the way Reginald Pennington saw things. Three hours after the shooting, he knows [defendant]. He knows this man to carry a big gun. Although he won't tell us now, he told it to the sergeant back on February 20th. He knows this

---

[28] *United States v Morlang,* 531 F2d 183, 190 (CA 4, 1975). See also *United States v Ragghianti,* 560 F2d 1376, 1381 (CA 9, 1977).

[29] *Morlang,* n 28 *supra* at 190.

man goes by in a gold Sunbird, in the passenger
seat. Within minutes, he's hearing shots. As soon
as it's out of eyesight, he's hearing shots. . . . [H]e
tells the sergeant he sees the gold car go by, this
man is the passenger, and then he hears shots.
That's what he originally says. And he talks about
this big gun, and he says he heard about 11 shots.

V

Our concern that the jury accepted the prior
statement as substantive evidence is heightened by
the lack of a limiting instruction to the jury when
Gale read the statement. The court should have
told the jury at the time of Gale's testimony that
it was only to consider it for impeachment pur-
poses.[30] But the judge did not do so until after the
conclusion of the proofs, when he instructed gener-
ally. That belated instruction did not refer to
Pennington or Gale by name. This omission of a
timely limiting instruction reinforces our conclu-
sion that error occurred.[31]

VI

During the reading of the statement, Gale
quoted Pennington as reporting that "[o]ne of my
friends . . . told me that [Jenkins] had shot [the
victim] in the head." He also quoted Pennington as
saying that Jenkins carried a .45 caliber automatic
pistol.[32] These statements posed the same hearsay
risk as the rest of Gale's testimony. But they also

---

[30] *United States v Lipscomb,* 425 F2d 226, 227 (CA 6, 1970); *United
States v Lester,* 491 F2d 680, 683 (CA 6, 1974); *United States v Kemp,*
504 F2d 421, 423 (CA 6, 1974).

[31] See *United States v Dye,* 508 F2d 1226, 1235 (CA 6, 1974), stating
that in the Sixth Circuit, "failure to give a limiting instruction with
respect to the use of extra-judicial statements is plain error."

[32] *Ante,* pp 253-254.

were irrelevant to the impeachment, and prejudicial to Jenkins.

Where an inconsistent statement contained in a writing contains other prejudicial information, "only so much thereof as contains the inconsistent statements should be admitted into evidence."[33]

*While testifying, Pennington had not mentioned either the gun or the friend's comment.* Gale's testimony in that regard went beyond the proper scope of impeachment.[34] When the prosecutor cross-examined Pennington about his statement, she read him the relevant passage, but omitted the reference to the friend's comment. The prosecutor alluded to this omission when Jenkins' lawyer objected to the cross-examination. Similarly, the prosecutor asked Gale about the gun, even though Pennington had not mentioned it when testifying.

VII

The errors were not harmless. Apart from the inadmissible evidence that Pennington had given a statement that he had seen Jenkins riding in an automobile toward the crime scene and gunfire erupted immediately afterwards, and that one of his friends told him that Jenkins had shot Harris, the only other evidence identifying Jenkins was Pride's testimony that Jenkins was the gunman. Brunner was unable to identify the gunman or Jenkins as an occupant of the vehicle.

There were inconsistencies in Brunner's and

---

[33] 81 Am Jur 2d, Witnesses, § 949, p 783. See also *State v Spadafore,* 220 SE2d 655, 664 (W Va, 1975); *People v Cannizzaro,* 1 NY2d 167, 169; 134 NE2d 206 (1956), reversing a conviction because of the admission for impeachment of the defendant's father's pretrial statement, which contained matters not mentioned in his testimony at trial.

[34] Gale's recital of Pennington's anonymous friend's comment, if taken as substantive evidence, was inadmissible as hearsay within hearsay. MRE 805.

Pride's testimony that could cause a jury to doubt their testimony. Pride's story on the color of the automobile kept changing from brown to "light gold." Brunner said it was purple, or something similar.

Pride's testimony that Jenkins was leaning out of the automobile to fire the gun might be seen as contradicting Brunner's testimony that he saw just a gun, not a person leaning out of the automobile. Moreover, Brunner testified that the victim had pointed a gun first at the passing automobile. Brunner also reported that, as the victim lay on the ground, Pride removed the victim's gun and jewelry.

Pride could not consistently identify the color of the automobile. The dissent's reliance on the trial testimony of Pride also omits several elements of Brunner's testimony that cast doubt on Pride's veracity. Unlike Pride, Brunner testified that the victim had pointed a gun first at the passing automobile. Brunner also reported that, as the victim lay on the ground, Pride removed the victim's gun and jewelry. Pride was not asked, and never specifically stated, that the victim had *not* pointed a gun at the passing automobile. Pride similarly did not state that he had *not* removed the victim's gun and jewelry. But these details might, but for the errors respecting Pennington's out-of-court statements, have led the jury to view Pride in an unfavorable light and question the value of his testimony.

The error in admitting Gale's testimony repeating hearsay statements was not harmless.

We reverse the decision of the Court of Appeals and remand for a new trial. On retrial, the prosecutor may impeach Pennington. If he testifies as he did at the earlier trial, the statement made to Gale may not be read word for word into evidence,

and may be read only to show that Pennington made inconsistent statements on a showing that Gale cannot testify from memory or memory refreshed and a proper foundation has been laid for reading appropriate portions of the memorandum of the statement as past recollection recorded.

If Gale is called to impeach Pennington's testimony, the jury must be instructed at that time that Gale's testimony is only to be considered for impeachment purposes. The statements attributed to Pennington's friend, and the reference to Jenkins' gun are not admissible as part of the impeachment.

Reversed and remanded for a new trial.

BRICKLEY, C.J., and CAVANAGH and MALLETT, JJ., concurred with LEVIN, J.

RILEY, J. (*dissenting*). At issue in this appeal is whether the trial court erred by permitting the impeachment of witness Pennington and by permitting the testimony of officer Gale. The majority concludes that it was proper to allow the impeachment, but that it was error to allow officer Gale's testimony regarding Pennington's prior statement because all written memoranda of oral statements are hearsay per se. *Ante* at 257-258. I agree that it was proper to allow the impeachment, but I disagree that it was error to admit the testimony because Pennington's prior statement, signed and adopted by Pennington when given to officer Gale, was used solely to impeach Pennington's trial testimony and therefore was not hearsay. Pennington's in-court testimony contradicted his earlier statement and, as a result, was unanticipated and injurious to the prosecution. Consequently, the prosecution could properly impeach him with his statement under the then-existing version of MRE 607(2)(C). Thus, I respectfully dissent.

I

The majority properly concluded that "[t]he trial judge did not err in allowing the prosecutor to impeach Pennington . . . ." *Ante* at 254. At the time of trial, a prosecutor could impeach his own witnesses if he was obliged to call them or their testimony was different from that anticipated.

The credibility of a witness may be attacked by

* * *

(2) the calling party if

(A) the calling party is the prosecutor and he is obliged to call the witness

* * *

(C) the witness's testimony was contrary to that which the calling party had anticipated and was actually injurious to the calling party's case. [MRE 607, as adopted January 5, 1978, effective March 1, 1978; 402 Mich cii (1978).]

In the present case, the prosecutor expected that Pennington would state he saw Jenkins just before the shooting in the same car that was used in the crime. Instead, Pennington testified that he did not see the car or Jenkins.

*Q.* So you've seen him in this gold Sunbird more than once?

*A.* Yeah.

*Q.* Did you see that gold Sunbird going past your house before you saw the shots—or heard the shots?

*A.* No.

*Q.* Did you see Mr. Jenkins in that gold Sunbird that day?

*A.* I don't remember.

*Q.* You don't remember?

*A.* No.

This testimony was contrary to Pennington's original statement:

> "At about 6 P.M., I'm sitting on the porch of 102 Leicester. A gold Sunbird rode past the house, and as soon as it got out of my eyesight, I heard the shooting. One of my friends came around there where I was at and told me that Steve had shot Demowens in the head. Steve is the one that drives the gold Sunbird."

Because Pennington's testimony at trial was completely unanticipated and injurious to the prosecution's case, the prosecutor could impeach him under MRE 607(2)(C).

Regardless of whether the prosecutor, at the time of trial, had a right to impeach Pennington, he would have a right in a new trial under the current version of MRE 607. Today, MRE 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Consequently, if a new trial were to be ordered, the prosecution could freely impeach Pennington about this matter.[1]

It is my opinion that the trial court properly allowed Pennington to be impeached. His testi-

---

[1] This very issue was addressed in a dissent I wrote in *People v Dunn,* 446 Mich 409, 433; 521 NW2d 255 (1994).

Furthermore, a remand of this case is an empty gesture because recent amendments of MRE 410 permit the evidence at issue to be presented at trial. MRE 410 now bars statements made during plea negotiations only if the statements are made to attorneys. In the instant case, the officers in question were obviously not attorneys, and they disavowed any pretense of possessing the authority of a government attorney. The evidence at issue, therefore, is admissible on remand. *United States v Bernal,* 719 F2d 1475, 1478 (CA 9, 1983); *Rachlin [v United States,* 723 F2d 1373, 1376 (CA 8, 1983)]. Hence, the granting of a new trial is simply "an empty gesture." *People v Sanford,* 402 Mich 460, 498; 265 NW2d 1 (1978) (RYAN, J., concurring).

mony at trial was directly contrary to his prior statement and injured the prosecution's case. As a result, the prosecutor had every right to use it for impeachment purposes. Moreover, MRE 607 has been changed to allow any party to impeach any witness at any time.

II

The trial court did not commit error requiring reversal by allowing officer Gale to testify regarding Pennington's earlier statement. As stated before, MRE 607(2)(C), at the time of trial, allowed the prosecutor to impeach Pennington since his testimony was unanticipated and injurious. The next question is whether officer Gale's testimony regarding Pennington's prior statement was proper.

Although Pennington's prior statement constituted extrinsic evidence it was still admissible for purposes of impeachment under MRE 613(b).

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

Here, Pennington was offered an opportunity to explain the difference between his prior and present statement.

> *Q. (By Ms. Neff)*: Sir, was your memory better back on February 20th, or today?
> *A.* I don't know. I probably was intoxicated on drugs on that day.

*Q.* Now, you were on drugs. Did you ever tell
the sergeant that you were on drugs that day?

*A.* He never asked me.

*Q.* But you never thought it was important to
tell him that?

*A.* No.

*Q.* You just gave him the statement and signed
your name?

*A.* Right.

*Q.* And, now, today, you remember nothing?

*A.* Right.

Furthermore, Jenkins was also offered a chance to
question Pennington about this discrepancy. Con-
sequently, all the requirements for the admission
of extrinsic evidence under MRE 613(b) were met.

The majority, however, argues that "a written
memorandum of an oral statement is itself hear-
say, allowing the impeaching witness to read from
the written memorandum of the statement consti-
tutes the admission of hearsay, unless a proper
foundation is laid for admission as past recollec-
tion recorded." *Ante* at 256. In order to support
this statement, the majority looks to *People v
Rodgers,* 388 Mich 513, 519; 201 NW2d 621 (1972).
In *Rodgers,* this Court wrote:

> The written memorandum was read to the jury.
> This constituted its admission in evidence. This
> was error. The writing was prepared by the Detec-
> tive Taylor, out of court and was not signed by the
> witness King. The writing was hearsay. It was an
> extrajudicial statement (by Taylor) offered to prove
> the truth of the thing said (that King had spoken
> the words imputed to him).

The majority's reliance on this case, however, is
misplaced. In *Rodgers,* the witness did not sign his
statement.

*Q.* Did Mr. King sign that statement?

*A.* No sir.

*Q.* And whose handwriting is that statement in?

*A.* This is my handwriting.

*Q.* Did you ask Mr. King to sign that statement?

*A.* Yes, sir, I did.

*Q.* And he refused?

*A.* Yes, sir. [*Id.* at 518.]

However, the officer who took the statement testified that he took it verbatim.

*Q.* . . . Did you take a written statement from Mr. King?

*A.* I wrote it down and Mr. King was talking.

*Q.* As Mr. King was talking to you, you wrote it down?

*A.* Yes, exactly word for word what he said. [*Id.* at 516.]

The fact that this statement was taken verbatim is crucial. As the United States Court of Appeals for the Second Circuit stated in *United States v Almonte,* 956 F2d 27, 29 (CA 2, 1992):

If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

In *Rodgers,* we do not have a summary characterization of a witness' prior statement. Instead, we have a verbatim word-for-word copy of the witness' statement; therefore, it is relevant and admissible to impeach if properly authenticated.

The manner in which to authenticate evidence is set out in MRE 901. Specifically, evidence can be authenticated by someone with knowledge.

(a) . . . The requirement of authentication or
identification as a condition precedent to admissi-
bility is satisfied by evidence sufficient to support a
finding that the matter in question is what its
proponent claims.

(b) . . . By way of illustration only, and not by
way of limitation, the following are examples of
authentication or identification conforming with
the requirements of this rule:

(1) *Testimony of witness with knowledge.* Testi-
mony that a matter is what it is claimed to be.

In *Rodgers,* the officer on the stand had knowledge
that the statement was authentic and he testified
about that fact.

One could argue that the officer's testimony was
not sufficient to authenticate the document. How-
ever, preliminary questions regarding the admissi-
bility of evidence are to be reserved to the trial
judge.

Preliminary questions concerning the qualifica-
tion of a person to be a witness, the existence of a
privilege, or the admissibility of evidence shall be
determined by the court, subject to the provisions
of subdivision (b). In making its determination it is
not bound by the Rules of Evidence except those
with respect to privileges. [MRE 104.]

Because the statement in *Rodgers* was authenti-
cated, it could be used to properly impeach the
witness' testimony.[2] Consequently, the Court al-

---

[2] This use of properly authenticated prior written statements for
impeachment is not uncommon. In *People v Taylor,* 159 Mich App
468, 474-475, n 8; 406 NW2d 859 (1987), the prosecution used a prior
letter written and signed by the defendant to impeach his testimony.
The Court found that the letter was properly authenticated under
MRE 901 even though the defendant would not admit writing it.

While defendant would not admit writing the letter, he also
said that he would not deny writing it. He acknowledged that
the letter was in his handwriting and that it bore his signature.

lowed its admission for impeachment purposes. Furthermore, because the statement was used to impeach and not to prove the truth of the matter asserted, hearsay was not an issue.[3] Consequently, this Court was mistaken in concluding that the statement constituted hearsay and was improperly admitted. As a result, the majority's reliance on this case is misplaced.

Extrinsic evidence of a prior inconsistent statement can be used to impeach but it cannot be used to prove the truth of the matter asserted, unless, of course, it falls within a hearsay exception.[4] In this case, Pennington's statement was only used for its proper purpose of impeachment. Although defendant claims that the prosecutor was actually offering this statement not to impeach, but to prove the truth of the matter asserted, the

> law does not ask the judge, either at trial or upon appellate review, to crawl inside the prosecutor's head to divine his or her true motivation. See 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 607[01], 607-20 (1993). [*United States v Ince,* 21 F3d 576, 580 (CA 4, 1994).][5]

He then went on to explain the letter by saying that it was written because he "wanted to get out of it." That constitutes "evidence sufficient to support a finding" of authenticity under MRE 901(a).

[3] " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted.*" MRE 801 (emphasis added). The majority conveniently omits acknowledging that an out-of-court statement is only hearsay if offered "to prove the truth of the matter asserted." If the statement is not offered for its truth, the statement cannot be hearsay.

[4] *Hileman v Indreica,* 385 Mich 1; 187 NW2d 411 (1971).

[5] MRE 613(b) and FRE 613(b) are essentially identical.

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party

Admitting Pennington's statement in order to impeach but not to prove the truth of the matter asserted does not pose a problem under MRE 105. "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Here the trial judge instructed the jury:

> Now, during the course of the trial, there's been some evidence tending to show that some of the witnesses made earlier statements which were inconsistent with testimony made during the course of the trial.
> These statements are not evidence which you can consider to satisfy or prove any of the elements of the crime charged, since the statements were not made under oath during the course of the trial. These statements or this evidence was permitted solely for the purpose of testing or judging the believability of the testimony which the witnesses did make under oath.

A proper example of how a prior inconsistent statement may be used to impeach the witness, in a situation remarkably similar to that at issue in this case, is given in Graham, *Impeachment of witness—Prior inconsistent statements,* 21 POF2d 101, 140-144. Specifically, Graham gives an illus-

is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2). [MRE 613(b).]

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2). [FRE 613(b).]

tration of how to introduce extrinsic proof of a
prior inconsistent statement.

§ 23. Introduction  of  extrinsic  proof—Written
statement
*Q.* Officer Jones, by whom are you employed?
*A.* The Greenville Police Department.

\* \* \*

*Q.* Did you have occasion to speak at that time
with John Black?
*A.* Yes, I did.

\* \* \*

*Q.* What did he answer?
*A.* Mr. Black said that he was on the other side
of the street about 40 feet away when the robber
ran out of the store.
*Q.* While you were talking to John Black what,
if anything, were you also doing?
*A.* While I was talking to Mr. Black, I was
writing down his answers to my questions in state-
ment form.
*Q.* What, if anything, did you do with the state-
ment when it was completed?
*A.* I handed it to John Black and told him to
read it over to be sure it was complete, accurate,
and truthful. I told him to make any changes he
desired, to initial any changes as well as initial
each page. I also asked him to sign the statement
at the bottom.
*Q.* Did John Black do so?
*A.* Yes, he did.

\* \* \*

*Q.* Officer Jones, would you please *read* from the
signed statement of John Black given on the day
of the incident what he said concerning his loca-
tion when he observed the robber? [*Id.* at 141-142
(emphasis added).]

This example offered by Graham closely paral-
lels the manner in which officer Gale acquired and

revealed Pennington's prior statement.[6] Officer Gale spoke to Pennington after the crime and wrote down his statement. He then showed this statement to Pennington, asked him to make any necessary changes, and to sign it. Pennington did so and even admitted at trial that he signed the statement.

*Q. (By Ms. Neff)*: Sir, did you tell Sergeant Ronald Gale of the homicide section, on February 20th, 1989, at approximately 9:20 in the evening that:

"At 6:00 P.M., I was standing on the porch at 102 Leicester. A gold Sunbird rode past the house and as soon as it got out of my eyesight, I heard the shooting. Steve is the one that drives the gold Sunbird. I ran around there. By the time I got there, the police were already there."

Then you were asked:

When you saw the gold Sunbird go past, did you see who was either driving or who was in the car?

And you answered:

"I saw the driver of the car and the passenger, but I didn't see who was in the back seat."

Now, did you or did you not tell Sergeant Gale that?

*A.* Yes, I did, and I told him there were several other cars that rode right behind this car.

*Q.* Did you say that on here, sir?

*A.* I told him that. I remember that much.

*Q.* Now, you signed this, right?

*A.* Right.

Because Pennington's statement and its acquisi-

---

[6] Incredibly, the majority questions why this example "does not indicate what exception to the hearsay rule is being invoked" and goes on to conclude that Graham must be applying the recorded recollection exception found in MRE 803(5). *Ante* at 257, n 20. Rather than requiring a hearsay exception to admit the prior inconsistent statement, however, Graham understands that the statement is being offered to *impeach* and not for the truth of the statement. Therefore, the statement is not hearsay and no exception is necessary.

tion so closely parallels Graham's example, it becomes easy to conclude that the statement was properly admitted.

### III

One portion of this statement has come under particular attack by the majority: where Pennington states, " 'One of my friends came around there where I was at and told me that Steve had shot Demowens in the head.' " The majority firmly contends that this constitutes hearsay. This contention, however, is erroneous. This portion of Pennington's statement was relevant for impeachment purposes and as such could not constitute hearsay. Under MRE 401, relevant evidence

> means evidence having *any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. [Emphasis provided.]

The Court of Appeals in *Grubaugh v St Johns,* 82 Mich App 282, 286; 266 NW2d 791 (1978), addressed this very issue and found "[t]estimony is relevant if it has a legitimate tendency to establish or disprove a material fact." At trial, Pennington indicated that he was not aware of Jenkins or this vehicle. In his prior statement, however, he stated that a friend told him Jenkins was involved. Consequently, that portion of his statement is directly relevant to impeach his testimony professing a lack of knowledge.

Furthermore, this portion of Pennington's statement is not substantially more prejudicial than probative under MRE 403:

> Although relevant, evidence may be excluded if

its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

MRE 403 requires a balancing to be performed between the probative nature of the evidence and its prejudicial effect. Generally, substantial discretion is granted to the trial judge in performing this balancing test.

The trial judge, not the appellate judge, is in the best position to assess the extent of the prejudice caused a party by a piece of evidence. The appellate judge works with a cold record, whereas the trial judge is there in the courtroom. [*United States v Long,* 574 F2d 761, 767 (CA 3, 1978).][7]

In this instance, Pennington's statement is probative because it serves to impeach his in-court claim of a lack of knowledge and it is not prejudicial because another witness, Emanuel Pride, testified that Jenkins committed the crime.

*Q.* I want to direct your attention, now back to February 20th of 1989. Were you with Demowens Harris and Carlos Brunner on that day?
*A.* Yes.
*Q.* Did something happen to Mr. Harris?
*A.* Yes.
*Q.* What happened to Mr. Harris?
*A.* He was shot.
*Q.* Were you there when he was shot?
*A.* Yes.
*Q.* Did you see who shot him?
*A.* Yes.
*Q.* Is he in the courtroom?

---

[7] Although *Long* is a federal case, FRE 403, which deals with the prejudicial effect of evidence, is identical to MRE 403.

*A.* Yes.

*Q.* Can you point him out for the jury, please? Pointing at Steven Jenkins?

*A.* Steven Jenkins.

Because Emanuel Pride testified that he saw Jenkins fire the gun, Pennington's statement that a friend told him that Jenkins shot Demowens was merely redundant. Consequently, its admission could not have been prejudicial. When the balancing is done under MRE 403 the admission of the portion of Pennington's statement was not substantially more prejudicial than probative. Moreover, even if it was error to admit this portion of the statement the error was harmless because what was disclosed had already been revealed by Emanuel Pride.

Given that Emanuel Pride testified unwaveringly that defendant gunned down the person standing next to him, any error in admitting Pennington's prior inconsistent statement was harmless. Although the majority attempts to portray Pride's testimony as inconsistent with that of another witness, Carlos Brunner, the truth is that their trial testimony was not inconsistent. Simply because Pride was able to testify with greater specificity about what occurred in those crucial seconds does not mean that his testimony was inconsistent with the more general testimony of Brunner.

IV

The trial court did not commit error requiring reversal by allowing Pennington to be impeached. His testimony at trial was unanticipated and injurious to the prosecution's case. It is my belief that under the then-existing MRE 607(2)(C) as well as

under the present version of MRE 607, impeachment was proper.

It is also my belief that officer Gale's testimony was properly admitted. The prosecution used officer Gale to further impeach Pennington's in-court testimony. Although officer Gale read part of Pennington's statement, this statement could not be considered hearsay because it was not being offered for the truth of the matter asserted, but merely to impeach Pennington's prior testimony.

I would affirm the Court of Appeals decision.

BOYLE and WEAVER, JJ., concurred with RILEY, J.