*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

NATHAN WAYNE SHAW,

Defendant-Appellant.

UNPUBLISHED
December 3, 2020

No. 347537
St. Clair Circuit Court
LC No. 18-001730-FH

Before: RONAYNE KRAUSE, P.J., and SAWYER and BOONSTRA, JJ.

RONAYNE KRAUSE, P.J. *(concurring)*

I concur with the majority's reasoning and conclusion that the prosecutor's use of alleged statements from defendant's wife, Mercedes Shaw, to the police did not affect the outcome of the proceedings. I write separately to provide additional reasons for that conclusion; and because I respectfully disagree with the majority that the prosecutor's violation of defendant's right to confrontation should be left unaddressed, even if that violation does not, under the specific circumstances of this case, warrant reversal.

## I. IMPEACHMENT OR SUBSTANTIVE EVIDENCE

I agree with, and will not repeat, the majority's analysis concluding that Mercedes Shaw's statements to the police were testimonial. Thus, they were inadmissible under the Confrontation Clause unless Mercedes was unavailable to testify and defendant had a prior opportunity to cross-examine her. *People v Walker*, 273 Mich App 56, 60-61; 728 NW2d 902 (2006); *Crawford v Washington*, 541 US 36, 52-55; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Additionally, under Michigan's spousal privilege statute, MCL 600.2162(2), Mercedes Shaw would have had to waive her spousal privilege in order to testify against defendant,[1] and there is no evidence in the record that she made any such waiver. See *People v Szabo*, 303 Mich App 737, 741-742; 846 NW2d 412 (2014). The record indicates that Mercedes Shaw was in the courtroom and thus the prosecutor

---

[1] Subject to exceptions not present here, such as where one spouse is a victim of some manner of wrong committed by the other spouse. See MCL 600.2162(3).

could have at least attempted to call her as a witness, subject to her right to exercise her spousal privilege. In any event, the record also establishes that defendant was unaware that she had given a statement.

As the majority observes, the Confrontation Clause does not preclude the admission of otherwise-testimonial statements for the purposes of impeachment or to attack credibility. Or, more specifically, "the Confrontation Clause applies only to statements used as substantive evidence." *People v Fackelman*, 489 Mich 515, 528; 802 NW2d 552 (2011). "Substantive evidence" means evidence used to prove or disprove the truth of a fact. See *Perry v F Byrd, Inc*, 280 Mich 580, 582; 274 NW 335 (1937). Thus, an inconsistent statement might be admissible to impeach a witness, but not to prove the truth of the prior statement—and admission would be improper even where there was a meaningful risk that the jury would be unable to distinguish between substantive evidence and impeachment evidence. See *People v Jenkins*, 450 Mich 249, 259-263; 537 NW2d 828 (1995).

## II. PROSECUTOR QUESTIONING

The prosecutor asked witness Jonathan Smith if he was aware that Mercedes Shaw had "said she was driving around with [Smith] because she was mad at [defendant] for drinking and wanting to drive the car." The prosecutor further asked Smith whether she had been angry at defendant for drinking and driving the truck, and attempted to elicit a confirmation "that Mercedes told the police she saw [defendant] leave driving the truck northbound on State [Street]." Although there was nothing improper about confirming that Mercedes rode with Smith that evening, the prosecutor's questions were unambiguously an attempt to introduce into evidence a statement from Mercedes to prove the substantive facts that defendant had keys to the truck and was actually driving the truck while drunk. This is improper. No possible impeachment purposes present themselves: Smith had not previously testified one way or the other about Mercedes Shaw riding with him, and he testified that he did not see defendant operating the truck while drunk. The prosecutor did not, for example, attempt to impeach Smith with a contradictory statement Smith had made to the police.

On direct examination, defendant and Breger both testified that defendant's truck could not be locked because the lock was broken, so keys were unnecessary to get into the vehicle. Defendant denied knowing where the keys were. On cross examination, the following exchange occurred:

> *Q*. Who's Mercedes Smith [sic] to you?
>
> *A*. My wife.
>
> *Q*. Is she here today?
>
> *A*. Yes.
>
> *Q*. Do you know that she gave a statement to police?
>
> *A*. I don't know.

*Q.* You don't know?

*A.* No.

*Q.* You were made aware – we watched the footage and the officer told you that your wife had made a statement to police saying she saw you driving.

*A.* Well my wife told me she did not make a statement.

*Q.* Okay. So, not only are the people who were hit by the car and the – those people are lying. The people who saw you they're, they're lying, now the officers are lying about who they talked to?

*A.* I don't understand.

*Q.* It just seems like – would you agree that a lot of people are lying in this situation to get you in trouble?

*A.* No.

*Q.* Well, okay. So, you're telling me that Mercedes told you she didn't make a statement?

*A.* Correct.

*Q.* And if Deputy Carrie Duva of the St. Clair County Sheriff's Department indicates that your wife did give a statement saying that she did see you driving and she was mad at you because you were drinking and insisted on driving the car you would say that's, you're saying that's a lie?

*A.* I don't know if she gave a statement or not. It's – I'm just going by what I was told.

\* \* \*

*Q.* So where did you park initially?

*A.* I couldn't, I couldn't tell. I'm not from that area.

*Q.* Was it in Algonac?

*A.* Yes.

*Q.* And that's in St. Clair County, correct?

*A.* I believe so, yes.

*Q*. All right. So now you're saying the car was originally parked in a different spot and then it was moved to the position that you've heard testimony where it was parked on Robbins Street, correct?

*A*. Correct.

*Q*. But you don't know how it got there?

*A*. I don't remember, no.

*Q*. You don't remember.

*A*. I don't remember how the car – who moved – I don't know who moved it from the original park to the Robbins Street.

*Q*. Okay. Could have been you, but you don't remember?

*A*. No, it couldn't have been me. I didn't have the keys.

*Q*. Mere, if Mercedes told Deputy Carrie Duva that she threw the keys at you when she was mad at you because you were insisting on driving would that be a lie?

*A*. I don't remember her throwing the keys at me, no.

*Q*. You don't remember her throwing the keys at you. Is that what you're saying?

*A*. Correct.

*Q*. So she could have thrown the keys at you and you don't remember?

*A*. I don't know.

*Q*. You either don't know or you don't remember?

*A*. I don't remember if she threw the keys at me.

\* \* \*

*Q*. Okay. So, somehow without your knowledge the car was moved from that original parking space to Robbins Street?

*A*. Correct.

*Q*. And so you, but you don't remember getting into an argument with Mercedes?

*A.* We – it – to me and her it's, it wasn't an argument. It's – that's just me and my wife we talk about things and we move on. Some people call that an argument. I call it just talking.

*Q.* So you do remember a conversation?

*A.* Yes.

*Q.* Was she mad?

*A.* She could have been, yes.

*Q.* Okay. So while you may not see it as argument you would acknowledge that she was mad at you?

*A.* I can't, I can't read her mind. No, I don't know.

*Q.* You've been married to her since 2011; isn't that correct?

*A.* Right, right.

*Q.* You can't read her mind, but you certainly know when your wife is angry at you?

*A.* Well like I said, I was intoxicated as well. And I didn't want nothing to do with her.

*Q.* Which way is it? Was she mad? You don't remember. Or you were – or what because you keep going for these different, you know, versions. You saw her, was she mad at you?

*A.* I honestly can't tell you. I don't know. It's just being my wife. We have our different type of relationship than most. And I don't – I just – I'm confused why that's a problem when we're not here for me and her. It's something, something totally different.

*Q.* If Mercedes told Deputy Carrie Duva that you two got in an argument because she was mad at you because you were drunk and you were insisting on driving--

*A.* I don't believe that to be true.

*Q.* Why, because you two don't argue?

*A.* Because I don't believe she thought I was going to drive. I don't think she would have thought I was going to drive. Why would I drive, I was drinking.

## III. CONFRONTATION CLAUSE VIOLATION

Significantly undermining the prosecution's argument that it was merely trying to impeach defendant, it is noteworthy that the prosecutor asked defendant multiple times whether other witnesses were lying. Doing so is blatantly improper. See *People v Dobek*, 274 Mich App 58, 70-71; 732 NW2d 546 (2007). I agree with the majority that such an inquiry might not be technically impermissible as to Mercedes Shaw or Deputy Carrie Duva, simply because they did not actually testify as witnesses. However, given the obviously testimonial nature of the statements at issue, even as to them, such a line of inquiry at least skirts the bounds of impropriety. In addition, it is clear that the prosecutor was affirmatively trying to introduce evidence to directly prove that defendant possessed the keys to the truck and had been directly observed by his wife driving the truck while drunk. If the prosecutor had simply asked defendant whether his wife threw the keys at him at some point that evening, such a question might have been proper impeachment. As posed, however, the prosecutor's questions were, again, clearly an effort to introduce Mercedes Shaw's testimony into substantive evidence.

I conclude that plain error occurred and defendant's confrontation rights were flagrantly violated.

## IV. OBJECTIVE VIDEO EVIDENCE

Notwithstanding the above analysis, I agree with the majority that defendant is not entitled to reversal because he cannot show that the error affected the outcome of the proceedings. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Under the circumstances, I cannot conclude that the prosecutor's improper questioning likely swayed the jury in any way. I do not disagree with the majority's observations about what the evidence showed. However, I rely primarily on comparing defendant's version of events to what is objectively depicted in the dashboard camera footage from Deputy Dennis Tuzinowski's police vehicle, which was played for the jury. Deputy Tuzinowski was the officer who initiated contact with defendant.

Ordinarily, only the trier of fact may resolve conflicts in evidence. *Nichol v Billot*, 406 Mich 284, 301-302; 279 NW2d 761 (1979). However, the courts may remove such a conflict from the jury's consideration if it is based on testimony that is physically or effectively impossible. See *People v Lemmon*, 456 Mich 625, 643-646; 576 NW2d 129 (1998). Objective and clear record evidence, such as a video recording, in the absence of allegations of tampering, that "blatantly" contradicts a party's differing version of events may discredit that version of events so utterly that no reasonable jury could believe it, thereby precluding a court from finding a genuine question of material fact. See *Scott v Harris*, 550 US 372, 378-381; 127 S Ct 1769; 167 L Ed 2d 686 (2007). I would not go so far as to say that the dash-camera footage from Deputy Tuzinowski's police vehicle renders defendant's version of events absolutely impossible, but it does render defendant's version of events extremely implausible.

On the video, defendant's truck appears at approximately 23:07:51, driving in the opposite direction from the police vehicle, with its headlights turned off, and driving partially on the curb. The truck disappears from the camera's view at 23:07:55, and the police vehicle almost immediately begins to make a three-point turn to follow the truck. The truck becomes visible again at 23:08:04, by which time it has turned right at a nearby intersection and apparently parked.

Although the driver's side was facing away from the police vehicle's perspective, the truck's brake lights are unambiguously turned on at that point, and they can be seen to turn off. The police vehicle takes a few seconds to reach the intersection, whereupon it turns behind the truck. Although the truck is not visible at that point, the camera's perspective sweeps most of the street, and no one is visible other than a few individuals who appear to be calmly walking away from the fireworks in the distance. Defendant himself becomes visible at 23:08:12, at which time he is already out of the truck, standing in the street, and smoking a cigarette. Defendant then turns and approaches the police vehicle with his hands up, whereupon he was ordered back by Deputy Tuzinowski.

According to defendant's version of events, he was asleep in the back of the truck and woke up to "screaming and yelling." According to defendant and his friend, Justin Breger, it was Breger who was driving the truck at that time. Defendant remained lying down in the back seat when the truck came to an "abrupt" stop, whereupon defendant hit his head on the back of the front seat. Breger said he was "getting out of here," and when defendant sat up, Breger was already out of the vehicle and running away up the street. Breger testified that when he drove past Deputy Tuzinowski's police vehicle, Breger could tell that the officer was "interested" in the truck, so he immediately pulled off to the side of the road, saw the police vehicle in the process of turning around, and fled. Defendant testified that he immediately got out, but he was still disoriented, so he then stood there and lit a cigarette. He explained that the truck had two rows of seats, and egress from the back seats through rear "suicide doors" required the front doors to be open first.

Importantly, the fact that the rest of the truck's lights were off to begin with, and that the video therefore clearly records the truck's *brake* lights in the process of turning off, raises a mandatory inference: whoever was driving the truck must have still been in the driver's seat at 23:08:04. Thus, there was a span of—at the most—eight seconds for: (1) Breger to exit the vehicle and run away far enough to no longer be within view; (2) defendant to sit up in the backseat and see Breger running away; (3) defendant to extricate himself from the back seat of the truck; and (4) defendant to light a cigarette. Although that might just barely be possible, the available time seems highly improbable. Critically, during its deliberations, the jury asked to review the video footage, and the testimonies of Shaw, Breger, and defendant. The video footage and Breger's testimonies were replayed for the jury, but the jury opted to rely on its memories regarding Shaw's and defendant's testimonies upon being told that, unlike what was depicted on television, transcripts were not automatically generated. Thus, not only does the video recording make defendant's version of events highly implausible, but it was also of great interest to the jury.

Under the circumstances, I simply cannot conclude that the prosecutor's blatantly improper references to Mercedes Shaw's alleged statements had any likely effect on the outcome of the proceedings. The jury was obviously interested in the video, and as noted, objective video evidence is one of the very few exceptions to the courts' deference to the jury's role in weighing credibility and resolving factual disputes. I do not believe the video needs to render defendant's version of events impossible; nevertheless, it renders defendant's version of events objectively implausible to a degree that precludes interference with the jury's findings.

## V. CONCLUSION

Because I share the majority's ultimate conclusion that the improper questioning was harmless, I concur with the majority that defendant is not entitled to reversal on the basis of the confrontation clause violation, and he cannot satisfy the prejudice prerequisite for ineffective assistance of counsel. I concur in affirming.

/s/ Amy Ronayne Krause