# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JESS WILLIAM BOWMAN,

Defendant-Appellant.

UNPUBLISHED
October 18, 2016

No. 327596
St. Clair Circuit Court
LC No. 14-002193-FC

Before: GADOLA, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to 20 to 40 years' imprisonment for the second-degree murder conviction and two years' imprisonment for the felony-firearm conviction. We affirm.

This case arises out of the murder of Timothy Belisle in front of defendant's mobile home. The dispute arose over glass that broke on the road in front of defendant's mobile home when Belisle was moving an old refrigerator. Defendant's girlfriend, Sarah Gelushia, and Belisle's girlfriend, Jessica Thomas, were also present during the homicide. Defendant's defense at trial was that he shot Belisle in self-defense or in defense of Gelushia.

## I. EVIDENCE ADMISSIBILITY

Defendant first argues that the trial court abused its discretion in limiting evidence concerning Gelushia's injuries and medical condition and in excluding evidence regarding Gelushia's purported fear of Belisle during the incident. Defendant makes a related claim, as he did in his unsuccessful motion for a new trial before the trial court, that he was deprived of his constitutional right to present a defense. We disagree with defendant's arguments.

"This Court reviews preserved evidentiary issues for an abuse of discretion. A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Orr*, 275 Mich App 587, 588; 739 NW2d 385 (2007) (citation omitted). "This Court reviews for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial. . . . This Court reviews de novo whether defendant suffered a deprivation of his constitutional right to present a defense." *People v Powell*, 303 Mich App 271, 276-277; 842 NW2d 538 (2013) (quotation marks and citations omitted).

-1-

In general, all relevant evidence is admissible and evidence that is not relevant is not admissible. MRE 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; see also *People v Mills*, 450 Mich 61, 66-67; 537 NW2d 909 (1995). "Evidence is admissible if it is helpful in throwing light on any material point." *Powell*, 303 Mich App at 277 (quotation marks and citation omitted). Evidence need not be directed to an element of a crime or an applicable defense in order to be deemed material. *Mills*, 450 Mich at 67. A fact is material if it is within the range of litigated matters in controversy. *Id*. at 68. Any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence comprises sufficient probative force for the purpose of determining relevance. *Id*. Nonetheless, relevant evidence may be excluded under MRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See MRE 403; *People v Yost*, 278 Mich App 341, 407-409; 749 NW2d 753 (2008).

Defendant challenges the trial court's limitation of evidence regarding Gelushia's preexisting neck injury, medical treatment, her allegedly fragile physical condition, and the exclusion of evidence concerning Gelushia's purported fear of injury at the hands of Belisle. Defendant contends that this evidence was relevant to his claim that he was acting in self-defense or in defense of Gelushia when he shot Belisle. In Michigan, the right to use deadly force in self-defense or in defense of others is set forth in MCL 780.972(1), which states:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.
>
> (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.

Therefore, a defendant must "have an honest and reasonable belief that there is a danger of death, great bodily harm, or a sexual assault in order to justify the use of deadly force." *People v Guajardo*, 300 Mich App 26, 35-36; 832 NW2d 409 (2013). The reasonableness of a defendant's belief "depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2011).

In the present case, the trial court's exclusion of evidence concerning Gelushia's state of mind fell within the range of principled outcomes. Defendant's self-defense or defense-of-others claim turned on whether he, not Gelushia, had an honest and reasonable belief that there was a

danger of death or great bodily harm. Testimony concerning Gelushia's supposed feelings would have confused the issue for the jury. The trial court did allow Gelushia to testify about Belisle's statements and behavior. For example, Gelushia testified that Belisle told her to "shut the f--- up[;]" that Belisle seemed angry and upset; and that, during his argument with defendant, Belisle got out of his truck, slammed the door, and came running around the front of the truck in a rage, reaching the right front corner of the truck near where Gelushia and defendant were standing. Gelushia testified that defendant then stepped in front of Gelushia and moved toward the front of the truck. Therefore, although the trial court excluded testimony concerning Gelushia's purported *feelings*, the court allowed Gelushia to testify about Belisle's alleged aggressive *actions*. Gelushia's testimony concerning Belisle's conduct was relevant to the defense theory of self-defense or defense of others. In addition, defendant testified about why he believed deadly force was necessary in light of his own perceptions.

The trial court also did not err in limiting Gelushia's testimony concerning her preexisting neck injuries and medical treatment. Defendant's theory was that Gelushia's neck injuries made her fragile, thereby supporting the reasonableness or honesty of defendant's perception that deadly force was justified to protect her from Belisle. Some evidence of Gelushia's physical condition was presented to the jury. Notably, the trial court allowed testimony concerning Gelushia's neck injuries and physical condition. Specifically, Gelushia testified that she had three neck surgeries before this incident because of a herniated disk, and that she had metal plates in her neck. Gelushia explained that because of these prior injuries, she could not physically have turned and run away during this incident. Gelushia further testified that defendant knew about her neck surgeries, went to the hospital with her, and aided in her recovery. Gelushia testified that she discussed her neck injuries with defendant, and that defendant knew about the metal in her neck and about her multiple surgeries when the incident in this case occurred. It was only after Gelushia testified to all of these facts that the trial court ruled *further* testimony on her medical treatment would be redundant. Regardless, defendant further testified about Gelushia's physical condition. Defendant explained his awareness of Gelushia's injuries, surgeries, and disability, all of which he knew about on the date of the homicide. Defendant said that if Gelushia "gets hit or falls down and hits her head it can kill her." The trial court did not abuse its discretion in limiting additional testimony regarding Gelishia's physical condition, nor did its limitation deprive the defendant of his defense that he had a reason based perception that Gelushia faced imminent grave physical harm.

Defendant also asserts that he should have been allowed to impeach Thomas with a prior inconsistent statement to a police detective. In the prior statement, Thomas supposedly said that Gelushia should not have felt threatened by Belisle's actions but that Thomas could see how some people might have felt threatened; at trial, Thomas denied making such a statement.[1]

---

[1] The police detective who interviewed Thomas recalled Thomas saying that Gelushia should not have felt threatened but did not recall Thomas saying that she could understand how some people might feel threatened. The detective agreed that she would not quarrel with the fact that Thomas made such a statement if it was depicted on the video of the interview. The full video of the interview was not admitted into evidence.

"When a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of the statement. The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement – not to prove the contents of the statement." *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995) (citations omitted). See MRE 613(b) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. . . .").

"However, extrinsic evidence may not be used to impeach a witness on a collateral matter even if the extrinsic evidence constitutes a prior inconsistent statement of the witness, otherwise admissible under MRE 613(b)." *Barnett v Hidalgo*, 478 Mich 151, 165; 732 NW2d 472 (2007) (quotation marks and ellipsis omitted), citing *People v Rosen*, 136 Mich App 745, 758; 358 NW2d 584 (1984). Impeachment evidence is not collateral if it relates to the substantive issues in the case or to matters closely bearing on the defendant's guilt or innocence, if it concerns facts showing bias or interest, or if it relates to the witness's account of the circumstances of a transaction about which the witness would not have been mistaken if his or her account was true. *Rosen*, 136 Mich App at 759. Defendant fails to address whether the prior statement was collateral. "Defendant's failure to properly argue the merits of the issue results in it being abandoned." *People v Lopez*, 305 Mich App 686, 694; 854 NW2d 205 (2014). As discussed, the self-defense or defense-of-others claim turned on whether *defendant* had an honest and reasonable belief that deadly force was justified and on *defendant's* perceptions. *Guajardo*, 300 Mich App at 35-36; *Orlewicz*, 293 Mich App at 102. What Thomas believed about what Gelushia should or could have felt thus did not relate to the substantive issues or concern a matter closely bearing on defendant's guilt or innocence or evidence bias against Gelushia or the defendant.

Even if the prior statement was not collateral, it was nonetheless subject to exclusion under MRE 403 given the risk of confusing the issues by injecting considerations of the feelings of persons other than defendant. Moreover, Thomas's credibility was already challenged in other ways, and defendant fails to explain why additional impeachment evidence would have made a difference in the jury's ultimate assessment of Thomas's credibility. For example, Thomas testified on direct examination that defendant "shoulder bumped" Belisle during the incident, but on cross-examination, Thomas testified that "there was no shoulder bumping. It was the way I was sitting that it looked like it." Later in her cross-examination, however, Thomas again said that defendant in fact did "shoulder bump" Belisle. Also, on cross-examination, Thomas said that she had described defendant as a "Mexican" but denied saying that "Mexicans walk different when they are mad." However, the police detective who interviewed Thomas testified that Thomas did in fact make such a statement. In light of the credibility challenges to Thomas that defendant was allowed to make, it is far from clear that additional impeachment evidence regarding whether Thomas made a statement about whether Gelushia could or should have felt threatened would likely have made a difference in the jury's ultimate assessment of Thomas's credibility.

Defendant also asserts that the limitation or exclusion of the evidence concerning Gelushia's feelings and her physical condition violated defendant's constitutional right to present a defense. "A criminal defendant has a state and federal constitutional right to present a

defense." *People v Kurr*, 253 Mich App 317, 326; 654 NW2d 651 (2002). "Although the right to present a defense is a fundamental element of due process, it is not an absolute right. The accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984) (quotation marks and citation omitted). The right to present a defense extends only to relevant and admissible evidence. *People v Likine*, 288 Mich App 648, 658; 794 NW2d 85 (2010), rev'd on other grounds by 492 Mich 367 (2012).

> The right to present a defense is not absolute or unfettered. A trial court may exclude evidence if its probative value is outweighed by factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Therefore, a court may exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues. [*Orlewicz*, 293 Mich App at 101 (citations omitted).]

As discussed earlier, the trial court admitted ample relevant evidence concerning Gelushia's physical condition and the defendant's awareness of that condition to support his self-defense or defense of others theory. The exclusion of irrelevant testimony regarding Gelushia's state of mind and additional evidence regarding her injuries and medical treatment did not deprive the defendant of his right to present a defense.

Even if the exclusion of the proffered evidence was an evidentiary or constitutional error, any such error does not require reversal. A preserved evidentiary error requires reversal only if the defendant establishes that it is more probable than not that the error was outcome determinative. *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001), citing *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999). "An error is deemed to have been 'outcome determinative' if it undermined the reliability of the verdict. In making this determination, the reviewing court should focus on the nature of the error in light of the weight and strength of the untainted evidence." *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000) (citations omitted). With respect to the purported deprivation of defendant's constitutional right to present a defense, the prosecutor has the burden of establishing beyond a reasonable doubt that such an error was harmless. See *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999). We conclude that the alleged errors were harmless under either standard.

As discussed, although testimony regarding Gelushia's purported feelings was excluded, the trial court permitted Gelushia to testify about Belisle's alleged conduct, including the fact that he purportedly came running around the front of the truck in a rage. The jury also heard ample evidence concerning Gelushia's neck injuries and surgeries. There is no reason to believe that additional evidence would have affected the outcome.

Moreover, the testimony of disinterested third parties indicates that defendant's behavior before and after the homicide was not that of someone who was merely acting in self-defense or in defense of his girlfriend. A dispatcher for the mobile home park security service testified that when defendant called about the broken glass, he sounded irate and said, "[Y]ou need to get f---ing security over here before I beat this guy's a--, have him cleanup his mess." The members of the Higbee family who came upon the scene immediately after the shooting testified that defendant looked angry and that he referred to Belisle as a "mother f-----," a "piece of s---," and

a "stupid mother f-----" as Belisle lay dying on the road. In particular, Warren Higbee testified that defendant said, "I just shot this mother f-----," and, "[S]omeone better call 911 and get this piece of s--- off the front of my house." Defendant then went into his mobile home and came back out with a cigarette and a canned beverage, his demeanor was cold, and he did not seem to care about what had happened. Defendant looked at the broken glass on the road, said, "[T]his stupid mother f-----[,]" and went back into the mobile home. Christina Higbee and Shelly Higbee testified consistently with Warren regarding defendant's demeanor and comments, albeit with minor, inconsequential variations in some of the words. The Higbees also said that Gelushia's demeanor was calm and that she was not crying or distraught.

Further, defendant's credibility was undermined during his testimony. Defendant claimed to suffer physical limitations that made him unable to defend himself in a fight. Defendant thus asserted that he had no other choice but to shoot Belisle or else defendant "would have been crippled worse than I am." Yet defendant acknowledged on cross-examination that he had pulled his new refrigerator up the five steps of his mobile home entrance and had pushed the old refrigerator out the door. Defendant's mother, who lived with defendant, acknowledged that defendant has a motorcycle, cleans the house, and shovels snow "[a] little bit." Defendant's treating physician testified that he would be surprised to learn that defendant mows the lawn, shovels snow, and has moved two refrigerators. And the medical examiner's testimony established that the gun was *at least* 2 ½ to 3 feet away from Belisle when it was fired, contrary to defendant's testimony that he and Belisle were in close proximity and even touching when the gun was fired.

In light of the evidence at trial, any error in the limitation or exclusion of the evidence at issue was harmless beyond a reasonable doubt. Defendant shot an unarmed man in a dispute over broken glass, and the evidence strongly contradicted defendant's claim that he acted in self-defense or in defense of Gelushia. Hence, even if an error occurred, it does not require reversal.

## II. JUDICIAL MISCONDUCT

Defendant next argues that he was denied a fair and impartial trial on the basis of judicial misconduct. We disagree.

"The question whether judicial misconduct denied [a] defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). Defendant failed to preserve this issue by objecting to the trial court's conduct in the trial court. *People v Sardy*, 216 Mich App 111, 117-118; 549 NW2d 23 (1996). Unpreserved issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764. Under the plain error rule, a defendant must demonstrate that an error occurred, that it was clear or obvious, and that it affected substantial rights, i.e., that it affected the outcome of the proceedings. *Id*. at 763. Once these requirements are satisfied, reversal is warranted only if

the error resulted in the conviction of an innocent defendant or seriously affected the fairness, integrity, or public reputation of the proceedings. *Id*. at 763-764.[2]

In *Stevens*, 498 Mich at 164, our Supreme Court explained:

A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review. Rather, the judgment must be reversed and the case remanded for a new trial.

In general, a judge may question witnesses. *Id*. at 173-174. "[T]he central object of judicial questioning should be to clarify. Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Id*. at 173 (citations omitted). But "[i]t is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally. It is essential that the judge not permit his own views on disputed issues of fact to become apparent to the jury." *Id*. at 174 (quotation marks and citation omitted). Further, "[a] judge should avoid questions that are intimidating, argumentative, or skeptical. Hostile questions from a judge are particularly inappropriate when the witnesses themselves have done nothing to deserve such heated inquiry." *Id*. at 175 (citation omitted).

In determining whether a judge's conduct pierced the veil of judicial impartiality and denied the defendant a fair trial, a fact-specific analysis is required. *Id*. at 171. "A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality." *Id*. "[A] reviewing court should consider the nature or type of judicial conduct itself. Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id*. at 172-173.

---

[2] But when the issue of judicial misconduct is preserved and the veil of judicial impartiality was pierced, a structural error requiring reversal exists. See *Stevens*, 498 Mich at 178-180.

Defendant contends that the trial court interfered with the presentation of evidence, belittled defense counsel, and questioned defendant in a hostile manner. Defendant asserts that the trial court exhibited hostility and skepticism regarding defendant's claim that his actions were necessary to save Gelushia's life given her medical condition, and that this hostility and skepticism were communicated to the jury through the trial court's tone, demeanor, and questioning during the testimony of Gelushia and defendant. Our review indicates that the trial court did not pierce the veil of judicial impartiality or deny defendant a fair and impartial trial.

Defendant identifies specific instances in which he thinks the trial court engaged in inappropriate conduct. First, defendant complains of the following comment by the trial court to defense counsel during defense counsel's cross-examination of Gelushia regarding her medical history: "You've made the point. She had these surgeries. We all know they're not minor surgeries. Made the point. Your client knew about them. We don't need to go into those areas any further. Because going into those would be redundant and thus irrelevant. So, please move on, Mr. Damman [defense counsel]." What defendant leaves out is that the trial court had earlier ruled that questioning of Gelushia regarding her medical condition "[s]hould be very short, very simple, very sweet. That's all we need to cover." The court did not wish to dwell on Gelushia's medical condition or to make the trial about her medical condition. When the trial court made this ruling, defense counsel said, "That's fine." During his cross-examination of Gelushia, defense counsel elicited testimony from Gelushia about her neck injuries and surgeries and the fact that defendant was aware of her injuries and surgeries. It was only when defense counsel sought to go into further detail about whether Gelushia had any disk fusions that the trial court intervened and said that defense counsel had covered the point adequately. After the court initially told defense counsel that the point had been made, defense counsel did not accept the court's direction and instead asked if he could make a record and then if he could ask further questions about whether Gelushia had been cleared for physical therapy. Given that defense counsel had earlier acquiesced in the court's limitation of this testimony but then challenged the court when the court indicated that it was time to move on, the trial court's comment at issue was an understandable and reasonable reaction to defense counsel's behavior and was not misconduct.

Defendant next challenges certain comments and questions of the trial court during defendant's testimony. Before defendant testified, defense counsel indicated outside the presence of the jury that he wished to question defendant about Gelushia's injuries and what defendant knew about the injuries. The trial court ruled that defendant could testify about what he knows from his personal observations but could not repeat what Gelushia or her doctors had told him because that would be hearsay. In response to this ruling, defense counsel repeatedly said, "Okay." Later, during defense counsel's direct examination of defendant, the following exchange occurred:

*Q*. All right. Do you know whether or not [Gelushia] has suffered any injuries?

*A*. Yes, I do.

*Q*. What types of injuries has she suffered?

*A*. She had a, she's got –

*THE COURT*: How would he know that Mr. Damman?

*THE WITNESS*: I've seen the medical.

*THE COURT*: Mr., excuse me, sir. How does he know that, Mr. Damman?

*Q*. Have you had conversations with her about this?

*A*. Yes.

*THE COURT*: Do you know this because she told you about it?

*THE WITNESS*: I've, I've seen, your Honor, I've seen her neck and –

*THE COURT*: Sir.

*THE WITNESS*: I've seen the cages literally.

*THE COURT*: Sir.

*THE WITNESS*: That was in her neck.

*THE COURT*: I, I'm asking you a question.

*THE WITNESS*: All right.

*THE COURT*: Do you know about this because of what she told you?

*THE WITNESS*: She literally showed me the cages that's from previous –

*THE COURT*: Apparently I'm not going to get a straight answer.

*THE WITNESS*: I don't know what you're trying, what, what am I doing wrong?

Defendant contends that in the above exchange, he was trying to answer the trial court's question, but the trial court cut him off and opined that he was being evasive.

After defense counsel elicited testimony from defendant that he has been to doctor appointments and hospital visits with Gelushia, that he has aided in her recovery, and that she is disabled and cannot work, the following question by defense counsel and exchange occurred:

*Q*. As it relates to her neck do you know what she has by way of any type of contraption or anything in her neck?

*MS. KELLY [the prosecutor]*: I guess I would object.

-9-

*THE COURT*:  This has to be something he has seen.  If it's something a doctor said or that she told him that is hearsay and he cannot provide that information.

A bench conference was then held outside the hearing of the jury, and defense counsel asked for permission to recall Gelushia to testify about what she told defendant.  The trial court stated that defendant could testify about what he has perceived of Gelushia's disability and pain.  The court noted that "we've been down this road.  I made my ruling and now you're trying to get it in any way."  The court said that defense counsel had ample opportunity to ask questions of Gelushia, and defense counsel responded that the court had precluded him from doing so.  The trial court responded that Gelushia "talked about three surgeries in her neck and this and that and about it, yes, okay.  And I said that's enough.  That establishes he knows we're not going to make this about her.  We're still not going to make this about her.  He can testify about what he saw, okay."  Defense counsel responded, "Fine."

Defense counsel then resumed questioning of defendant, who testified that Gelushia's "neck is it's, it's literally got cages in it holding it together.  I've seen the old cages.  I've been to her doctors, seen the x-rays of the new cages."  The following exchange then occurred between the trial court and defendant:

>*THE COURT*:  What you have seen, sir, what you have seen with your own eyes.

>*THE WITNESS*:  That is.

>*THE COURT*:  You cannot repeat what a doctor said.

>*THE WITNESS*:  No, I seen those with my own eyes.

>*THE COURT*:  You're obviously not qualified to read an x-ray, so you can't tell me –

>*THE WITNESS*:  They show you.

>*THE COURT*:   - what's on an x-ray.  Sir, I'm not expecting you to respond.

>*THE WITNESS*:  Okay.

>*THE COURT*:  I'm giving you instruction.  So I would merely ask that you listen carefully, okay.

>All right.  What you have seen about her abilities or disabilities that's what you can tell us about, okay.  What you have seen about her discomfort you can tell us about that.

>Go ahead, Mr. Damman.

Defense counsel then elicited testimony from defendant about Gelushia's disabilities, and defendant said that "[i]f she gets hit or falls down and hits her head it can kill her." Defendant also testified about Gelushia's surgeries, her use of a wheelchair and a cane, the fact that she does not exercise, her lack of equilibrium, her dizzy spells, the risk of her falling, and the fact that defendant knew about all of this on the date of the incident.

Defendant asserts that the above comments and questions by the trial court were improper. First, defendant challenges the trial court's underlying evidentiary ruling. According to defendant, his understanding of Gelushia's medical condition was relevant to his belief that she was in imminent danger, and it thus did not matter whether his belief was true as long as he honestly and reasonably believed it. Hence, defendant asserts, his proposed testimony did not comprise hearsay because it was not offered to prove the truth of the matter asserted. Second, defendant contends that even if it was proper to restrict defendant's testimony to what he knew from his personal observation of Gelushia, the trial court's participation was defensive and hostile and suggested that defendant was being evasive. According to defendant, the court's questioning communicated to the jury the court's own view of defendant and his defense.

We disagree with defendant's argument. Defendant did not raise his challenge to the trial court's underlying hearsay ruling in his statement of questions presented. That argument is thus waived. *People v Bennett*, 290 Mich App 465, 484 n 4; 802 NW2d 627 (2010). Moreover, defendant cites no authority in support of his contention that the trial court's underlying hearsay ruling was erroneous. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Defendant thus has not properly presented for appellate review a challenge to the underlying hearsay ruling. *Id*. Indeed, defense counsel did not challenge the trial court's initial ruling that defendant could testify about what he knows from his personal observations but could not repeat what Gelushia or her doctors had told him because that would be hearsay. In response to this ruling, defense counsel repeatedly said, "Okay." Once the trial court made this ruling and defense counsel essentially acquiesced in it, the court was permitted to enforce its ruling. When defense counsel asked defendant what types of injuries Gelushia had suffered, the trial court reasonably directed defense counsel to inquire how defendant would know the types of injuries she had suffered. Defense counsel then asked defendant if he had conversations with Gelushia about her injuries, and defendant answered, "Yes." Because the question and answer seemed to suggest that defendant's testimony was going to contravene the trial court's earlier ruling that defendant could testify about his observations but not what Gelushia or her doctors told him about her injuries, the trial court understandably questioned defendant about whether his understanding of Gelushia's condition came from what Gelushia told him about it. Rather than directly answering the trial court's question, defendant testified to the substance of her condition by stating that he had seen the "cages" that were allegedly supporting Gelushia's neck. The trial court thus reasonably concluded that defendant was avoiding answering the court's question about whether his knowledge was based on what Gelushia told him.

Nonetheless, the trial court's comment in front of the jury that "[a]pparently I'm not going to get a straight answer[]" was improper because it could be viewed as expressing skepticism or as being argumentative. Nonetheless, this isolated comment was not so egregious

that it created an appearance of advocacy or partiality against defendant. See *Stevens*, 498 Mich at 171. The court did not express disbelief of the substance of defendant's testimony concerning his defense but merely expressed frustration that defendant seemed to be avoiding a direct answer of the court's precise question regarding the basis of defendant's knowledge, which was pertinent to the court's earlier evidentiary ruling. Moreover, the trial court instructed the jury at the close of trial as follows:

> Now my comments, rulings, questions and instructions are also not evidence. It is my duty to see that the trial is conducted according to the law and to tell you the law that applies to this case. However, when I make a comment or given an instruction I'm not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how much, how you should decide the case, you must pay no attention to that opinion. You are the only judges of the facts and you should decide this case from the evidence.

Jurors are presumed to follow their instructions, and the trial court's instruction was adequate to ensure a fair trial despite the court's minor and brief inappropriate comment. *Id.* at 177, 190.

Also, the subsequent comments in which the trial court said that defendant cannot repeat what a doctor had said and was not qualified to read an x-ray were not improper. Again, the trial court was merely enforcing its underlying evidentiary ruling. Defendant's earlier answer had suggested that he was testifying on the basis of his observation of x-rays, and the trial court reasonably stated that defendant lacked any qualification to read an x-ray. The trial court again emphasized that defendant could testify about his own perceptions of Gelushia's disabilities or discomfort. Defendant was then permitted to testify to that effect, describing Gelushia's disabilities and the risks associated with her getting hit or falling down. Defendant was thus able to present substantive testimony concerning Gelushia's alleged injuries and disabilities in support of his defense. The trial court's comments made when enforcing its earlier evidentiary ruling did not pierce the veil of judicial impartiality.

Defendant also claims that the trial court demonstrated impatience and hostility by telling Gelushia to "answer the question" on two occasions during her testimony:

> *Q*. Could you reach out and touch [Belisle]?
>
> *A*. No, I could not.
>
> *Q*. Could [Belisle] reach out and touch you from your view of the facts?
>
> *A*. I thought he could. I thought it was coming closer.
>
> *THE COURT*: Ma'am, just answer the question.
>
> *THE WITNESS*: Yes.

* * *

*Q.* And at any, there was no point that [Belisle] ever made it around your side of the car, true?

*A.* He got to the corner of the car.

*THE COURT*: Ma'am, would you just –

*THE WITNESS*: Yes.

*THE COURT*: - answer the question, please?

Defendant argues that Gelushia's answers were responsive but that the trial court suggested that she was being evasive or untruthful. We disagree. Although perhaps subject to interpretation, Gelushia's answers could be viewed as either insufficiently responsive or injecting information beyond that necessary to answer the question. In answering the question whether Belisle could reach out and touch her, Gelushia said that she thought he could, but she then added that she "thought it was coming closer[,]" which the trial court reasonably concluded was adding information beyond that needed to answer the question. And in responding to a question of whether Belisle made it to her side of the vehicle, Gelushia said that "[h]e got to the corner of the car." Again, Gelushia's response could be read as insufficiently responsive or as avoiding a direct answer. The trial court's direction to Gelushia to answer the questions fell within the court's authority to control the presentation of evidence. See MCL 768.29 (the trial court must control the proceedings and limit the introduction of evidence to relevant and material matters "with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."); MCR 2.513(B) ("The trial court must control the proceedings during trial [and] limit the evidence and arguments to relevant and proper matters . . . ."); MRE 611(a) (requiring a court to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence); *People v Mosley*, 338 Mich 559, 566; 61 NW2d 785 (1953) (the trial judge has authority to control the presentation of proofs); *People v Paquette*, 214 Mich App 336, 340; 543 NW2d 342 (1995) ("A trial court has wide, but not unlimited, discretion and power in the matter of trial conduct.").

Defendant also makes a cursory complaint that the trial court at various points told defense counsel to "move on" while making his opening statement or questioning a witness, but again, this fell within the trial court's authority to control the proceedings. Indeed, with respect to most of the instances in which the trial court made such a comment, defendant fails even to address why he thinks it was inappropriate for the trial court to tell defendant to move on. Defendant has thus failed to make a sufficiently elaborated appellate argument on this point. *Kelly*, 231 Mich App at 640-641.

Defendant next asserts that the trial court made its own objections, including by asking defense counsel how a line of questioning fell within the scope of redirect examination and by stating that the questions arguably should have been asked on direct examination. Defendant fails to provide a citation to the record in support of his argument on this point (although he does quote the relevant exchange in his brief). "Because defendant has not supported his argument with citations to the record, as required by MCR 7.212(C)(7), we need not consider his argument. Defendant may not leave it to this Court to search for a factual basis to sustain or

reject his position." *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) (quotation marks and citation omitted). In any event, defendant fails to explain how or why the trial court was wrong to make the inquiry and comment at issue. His argument on this point is thus inadequately presented, *Kelly*, 231 Mich App at 640-641, and there is no basis to conclude that the trial court's comments created the appearance of advocacy or partiality against defendant.

Defendant next takes note of the fact that the trial court stopped defense counsel's closing argument when a 30-minute time limit had expired. The parties and the trial court agreed to limit closing argument to 30 minutes for each side. Defense counsel explicitly told the trial court, "Half an hour would be plenty for me." Later, when defense counsel's 30 minutes of closing argument had expired, the trial court interrupted defense counsel's argument to let him know about the expiration of his allotted time, and the following exchange occurred:

> *THE COURT*: Mr. Damman, your half hour's up.
>
> *MR. DAMMAN*: Judge, I would ask for a few more moments.
>
> *THE COURT*: No.
>
> *MR. DAMMAN*: You're cutting me off?
>
> *THE COURT*: Wrap it up.
>
> *MR. DAMMAN*: Okay.
>
> *THE COURT*: You got one sentence. Wrap it up.
>
> *MR. DAMMAN*: Judge, I don't think I can wrap it up in one sentence.
>
> *THE COURT*: Well, I'll give you one sentence.
>
> *MR. DAMMAN*: Judge, I have, with all due respect I've got 28 minutes and 54 seconds on my phone.
>
> *THE COURT*: Well, you're using it up. Mr., please wrap it up.

Defense counsel then continued his argument with nine more sentences, and the trial court intervened again, as follows:

> *THE COURT*: Mr. Damman.
>
> *MR. DAMMAN*: My last sentence –
>
> *THE COURT*: You're finished.
>
> *MR. DAMMAN*: Thank you, Judge. I'd ask for a not guilty on all three charges.

*THE COURT*: Please sit down, Mr. Damman. I'm going to allow Mrs. Kelly the courtesy of giving a rebuttal argument if she wishes to. I don't know at what point you started timing, but I started timing you from the moment you got to the podium and you are three minutes over. My timing rules.

Go ahead, Mrs. Kelly. You may have an additional three minutes in rebuttal should you wish to use it.

Later, after the jury was excused following the conclusion of closing arguments, the trial court made the following comment:

Wait for the door to close and I'd like to say something.

Mr. Damman, I have had [sic] never before had a lawyer treat me with the level of disrespect with which you treated me when I told you your time had elapsed. I'm the one who keeps the time. It is my time that rules. At this particular moment I am inclined to sanction you for your behavior. Throughout this trial you have been telling me what to do. I don't appreciate it. So, I would, I'm going to think about whether I'm going to do anything about this, but never, never have I had a lawyer behave that way toward me, and certainly not in front of a jury. Frankly, you should be ashamed of yourself. And I'll leave it at that. See you back in ten minutes.

It is not clear why defendant thinks that the trial court's enforcement of a time limit to which defense counsel himself had agreed comprised judicial misconduct. "The court may impose reasonable time limits on the closing arguments." MCR 2.513(L). The trial court's comments on this matter in the presence of the jury did not belittle defense counsel but merely enforced the parties' agreed-upon time limit in the face of defense counsel's repeated requests for more time than he had already agreed he would need. The trial court's comments criticizing defense counsel outside the presence of the jury did not improperly influence the jury given that the jury did not hear those comments. See *People v Conley*, 270 Mich App 301, 310; 715 NW2d 377 (2006) ("If the jury was not present during the exchange, [the defendant's] right to a fair and impartial jury was not violated."); *People v Jackson*, 98 Mich App 735, 740; 296 NW2d 348 (1980) (rejecting a claim of judicial misconduct where most of the allegedly improper comments occurred outside the presence of the jury).

Overall, we conclude that defendant has failed to establish that the judicial veil of impartiality was pierced. Nearly all of the judicial comments that are challenged on appeal comprised proper efforts to control the conduct of trial. See *Paquette*, 214 Mich App at 341. The single inappropriate comment that the trial court made was not so egregious that it created an appearance of advocacy or partiality against defendant, *Stevens*, 498 Mich at 171, and the trial court's general curative instruction given at the close of trial was sufficient to ensure a fair trial

despite the court's minor and brief inappropriate comment, *id*. at 177, 190.

Affirmed.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens